UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **OATEY COMPANY,** | : | **Case No.  1:03CV1231** |
| | : | |
| | : | |
| **Plaintiff,** | : | **JUDGE KATHLEEN M. O'MALLEY** |
| | : | |
| **v.** | : | |
| | : | |
| **IPS CORPORATION,** | : | **MEMORANDUM AND OPINION** |
| | : | |
| | : | |
| **Defendant.** | : | |

Plaintiff Oatey Company brings this action against defendant IPS Corporation, asserting that IPS has infringed a patent owned by Oatey covering the invention of a washing machine drain outlet box.  Specifically, Oatey alleges that: (1) it owns U.S. Patent No. 6,148,850 ("the `850 patent"), which is directed at a washing machine drain outlet box designed to simplify the plumbing installation process; and (2) IPS sells a product that infringes Oatey's `850 patent rights.  Based on these allegations, Oatey claims IPS has willfully infringed, contributed to, or induced the infringement of, various claims contained in the `850 patent.

In response, IPS has asserted a number of counterclaims against Oatey.  First, IPS seeks a declaration that Oatey's patent is invalid.  Specifically, IPS claims that the Court should declare the `850 patent invalid, void, and unenforceable, due to obviousness, prosecution history estoppel, the

on-sale bar, and/or a number of other defects in the patent, and the Court should therefore declare that IPS has not infringed nor induced or contributed to any infringement of a valid patent.  IPS also asserts counterclaims against Oatey for: (1) engaging in deceptive trade practices in violation of Ohio Rev. Code §4065.01 et seq.; (2) tortious interference with business relationships; and (3) tortious interference with contractual relationships.

Pursuant to Markman v. Westview Instruments, 517 U.S. 370 (1996), the Court held a hearing to determine the meaning or construction of the patents' claims, as a matter of law.  In advance of that hearing, the parties first submitted a joint claims construction chart, identifying areas of agreement and areas of dispute; later, they submitted separate briefs urging a certain construction for each disputed claim term.  The initial claims construction chart indicated the parties were in dispute over the construction of a dozen or more terms contained in claims 1, 2, 3, 5, & 17 of the `850 patent.  As often happens, however, the parties' subsequent briefing narrowed the issues substantially, to the point that, at oral argument at the Markman hearing, the parties agreed the case turns on one critical phrase: the "first and second juxtaposed drain ports in said bottom wall."[1]  The Court's construction of this phrase resolves most of the parties' arguments over the meaning of the other disputed pieces of claim language.

The Court's analysis and construction of the disputed claim language is set out below.  The nub of the Court's conclusion is that, Oatey did not act as its own lexicographer when it stated that "the oblong opening in the bottom wall (in conjunction with the tailpiece) may itself define the drain

---

[1] See, e.g., Markman Tr. at 4 (Oatey's counsel affirming that "this case turns very simply on the fact that the only real term at issue is the first and second juxtaposed drain ports"); id. at 28 (IPS's counsel agreeing that "the matter before the Court has been framed as to whether there was an explicit definition . . . in the patent of first and second juxtaposed drain ports").

ports." See '850 Patent, col. 2, lines 31-33 .   The Court, accordingly, affords the phrase "first and second juxtaposed drain ports" its ordinary meaning and declines to import Oatey's disclosed alternative embodiment into that claim language.

Because the parties' respective positions appeared to pit the common dictionary definitions of the claim language against certain express, but apparently contrary, language in the specification, the Court withheld ruling in this case pending the Federal Circuit's En Banc decision in Phillips v. AWH Corporation, 415 F.3d 1303 (Fed. Cir. 2005). There, the Federal Circuit addressed "the extent to which we should resort to and rely on a patent's specification in seeking to ascertain the proper scope of its claims." Id. at 1312.  Ultimately, the Court concludes that, though informative of the claim construction process generally, Phillips does not dictate the result Oatey urges in this case.


## I.  LEGAL STANDARDS.

The construction of a patent and the terms contained therein is an issue to be determined by the Court, as a matter of law.  Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995), affirmed, 517 U.S. 370, 372 (1996).  In construing a claim, the court determines "the meaning and scope of the patent claims asserted to be infringed."  Id.  Construction of the claims is the first step in a "two-step analysis" of infringement.  Elekta Instrument S.A. v. O.U.R. Scientific Int'l., Inc., 214 F.3d 1302, 1306 (Fed. Cir. 2000).

"In construing claims, the analytical focus must begin and remain centered on the language of the claims themselves, for this is the language that the patentee chose to use to 'particularly point out and distinctly claim the subject matter which the patentee regards as his invention.' 35 U.S.C. § 112, ¶ 2."  Interactive Gift Express, Inc. v. Compuserve, Inc., 256 F.3d 1323, 1331 (Fed. Cir.

2001); see also Phillips, 415 F.3d at 1314 ("the claims themselves provide substantial guidance as to the meaning of particular claim terms").  "The terms used in the claims bear a heavy presumption that they mean what they say and have the ordinary meaning that would be attributed to those skilled in the relevant art."  Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002); see also Markman, 52 F.3d at 986 (claims are construed from the vantage point of a person of ordinary skill in the art).  To ascertain the meaning of the claims, a court primarily should consider three things: the language of the patent claims, the patent specification, and the prosecution history.  Insituform Tech., Inc. v. Cat Contracting, Inc., 99 F.3d 1098, 1105 (Fed. Cir. 1996); Markman, 52 F.3d at 979.  The claim language itself defines the scope of the claim, and "a construing court does not accord the specification, prosecution history, and other relevant evidence the same weight as the claims themselves, but consults these sources to give the necessary context to the claim language."  Eastman Kodak Co. v. Goodyear Tire & Rubber Co., 114 F.3d 1547, 1552 (Fed. Cir. 1997).  Thus, a Court should construe claim terms as having the meaning ascribed to them by one of ordinary skill in the art unless the patent specification or prosecution history indicates a contrary meaning.  Phillips, 415 F.3d at 1313 ("the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."); see also Northern Telecom Ltd. v. Samsung Electronics, 215 F.3d. 1281, 1287 (Fed. Cir. 2000) ("Claim language is given its ordinary and accustomed meaning except where a different meaning is clearly set forth in the specification or where the accustomed meaning would deprive the claim of clarity.")

     In determining the meaning to be given claim terms, those terms must be read in the context of the specification because it is the patent specification which, by statute, must contain a "full, clear,

concise and exact" description of the invention.  35 U.S.C. § 112 ¶ 1; Phillips, 415 F.3d at 1311.

Thus claim terms must be construed so as to be consistent with the specification.  Id. at 1315.

Thus, the specification may teach that a claim term is to be given a meaning which differs

from the ordinary meaning of such term.  For example, the patentee may use the specification as a

sort of dictionary, by defining expressly the terms used in the claims.  Markman, 52 F.3d at 979.  In

such instances, the patentee is deemed to have acted as his own lexicographer and it is those

definitions, even if they dictate unusual meanings for the language employed, which must control.

Texas Digital, 308 F.3d at 1204.

Care must be used in reading the specification, however, because while a patentee can "act

as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning,

the written description in such a case must clearly redefine a claim term so as to put a reasonable

competitor or one reasonably skilled in the art on notice that the patentee intended to so redefine that

claim term."  Elekta, 214 F.3d at 1307 (quoting Process Control Corp. v. HydReclaim Corp., 190

F.3d 1350, 1357 (Fed. Cir. 1999)) (internal quotation marks omitted).

Although claims must be read in view of their specification, the Federal Circuit repeatedly

has cautioned against limiting the scope of a claim to the preferred embodiment or specific examples

disclosed in the specification.  See Ekchian v. Home Depot, Inc., 104 F.3d 1299, 1303 (Fed. Cir.

1997) ("While examples disclosed in the preferred embodiment may aid in the proper interpretation

of a claim term, the scope of a claim is not necessarily limited by such examples");  Intervet

American, Inc. v. Kee-Vet Laboratories, Inc., 887 F.2d 1050, 1053 (Fed. Cir. 1989) ("limitations

appearing in the specification will not be read into claims, and that interpreting what is meant by a

word in a claim 'is not to be confused with adding an extraneous limitation appearing in the

5

specification, which is improper'") (citation omitted). Similarly, both the Federal Circuit and the Supreme Court have cautioned against using the specification to expand the scope of the claims. Johnson v. Johnston, 285 F.3d 1046,1052 (Fed. Cir. 2002) (citing McClain v. Ortmayer, 141 U.S. 419, 424 (1891) ("The claim is the measure of [that patentee's] right to relief, and while the specification may be referred to, to limit the claim, it can never be made available to expand it.")).

Beyond the specification, the Court may also look to the patent's prosecution history if it is a part of the record in the case.  Markman, 52 F.3d at 980.  "This 'undisputed public record' of proceedings in the Patent and Trademark Office ["PTO"] is of primary significance in understanding the claims."  Id.; Phillips, 415 F.3d at 1317 ("Like the specification, the prosecution history provides evidence of how PTO and inventor understood the patent claims.")  Again, however, although the prosecution history "can and should be used" when construing the claims, it "cannot 'enlarge, or diminish or vary' the limitations in the claims."  Id. (citation omitted).

In addition to the intrinsic record, the Court may also consider extrinsic evidence such as dictionaries, encyclopedias, treatises and inventor and expert testimony to assist it in understanding the technology at issue or in determining the meaning or scope of terms in a claim.  Phillips, 415 F.3d at 1317-18.; see also Aqua-Aerobic Systems, Inc. v. Aerators, Inc., 211 F.3d 1241, 1244-45 (Fed. Cir. 2000); Hoechst Celanese Corp. v. BP Chemicals LTD., 78 F.3d 1575, 1579 (Fed. Cir. 1994), cert. denied, 117 S.Ct. 275 (1996).  While such evidence is generally considered less reliable than the intrinsic record (for a variety of reasons), the Court is free to consider it, and may do so at any stage of its inquiry.  Id. at 1318-19; see also Free Motion Fitness Inc., v. Cybex Int'l, Inc., 423 F.3d 1343, 1348-49 (Fed. Cir. 2005).

A final claim construction principle must also be mentioned in the context of this case: claim

differentiation.  There is presumed to be "a difference in meaning and scope when different words or phrases are used in separate claims." United States v. Telectronics, Inc., 857 F.2d 778, 783 (Fed. Cir. 1988).  There is a presumption against construing claims as being so similar as to "make a claim superfluous." Id. at 784.  That claims are presumed to differ in scope, however, "does not mean that every limitation must be distinguished from its counterpart in another claim, but only that at least one limitation must differ." Kraft Foods, Inc., v. International Trading Co., 203 F.3d 1362, 1368 (Fed. Cir. 2000).  The doctrine of claim differentiation, moreover, "only creates a presumption that each claim in a patent has a different scope; it is 'not a hard and fast rule of construction.'" Id. (citing Comark Communications, Inc. v. Harris Corp., 156 F.3d 1182, 1186 (Fed. Cir. 1998)). "[C]laim differentiation cannot broaden claims beyond their correct scope . . .." Multiform Dessicants, Inc. v. Medzam, Ltd., 133 F.3d 1473, 1480 (Fed. Cir. 1998).

With all of these principles in mind, the Court turns to the parties' dispute over the claim language employed in the `850 patent.


## II.  CONSTRUCTION ANALYSIS.

### A. Overview of the Invention.

The Court begins its analysis with an overview of the plumbing problems that the patented invention is directed at solving.  As anyone who has done their own laundry knows, a washing machine, during various points of its clothes-washing cycle: (1) receives hot and cold water; and (2) expels waste water.  The hot and cold water arrive via plumbing supply pipes contained in the building or house where the washing machine resides; the waste water is pumped out of the washing machine through a drain pipe or hose, which is connected to the drainage system of the same

building.  In older homes, these supply and drain pipes are often not neatly grouped.  For example, the washing machine's drain hose may simply expel the waste water into a large sink basin, which is itself connected to a drain in the floor.  The end points of the cold and hot water supply pipes (e.g., wall-mounted faucets) may be some distance from this drain, and the two faucets may not be situated closely together.  This arrangement is, at the very least, inelegant, and can make connection of a washing machine messy or difficult.

In contrast, relatively newer homes are frequently constructed with a built-in device known as a "washing machine outlet box" or "WMOB." See illustration below.[2]  A fairly uncomplicated device, which was first invented in the 1950s, the WMOB is sized to fit between two wall studs, with the outer edge of the open-faced box flush with the wall.  The simplest WMOB generally has: (1) two inlet holes (usually 1" in diameter), which receive the hot and cold water supply pipes, and that hold the hot and cold water faucets to which the washing machine hoses connect; and (2) an outlet hole (usually 1½ or 2" in diameter), which is connected to the house drainage system in which the drain hose from the washing machine is hooked.  Thus, contained within the WMOB are all the connections necessary for the washing machine: the hot and cold supply pipe faucets, and also the drain connection.  This design allows for a clean and neat plumbing installation and simplifies a homeowner's effort to connect his washing machine.



---

[2]  This illustration is a modified drawing taken from a 1974 U.S. Patent (No. 3,847,175).

While the simplest WMOB is essentially an open-faced box with three holes – two holes for supply pipes, and one hole for a drain pipe – inventors have created WMOB designs to accommodate various additional needs.  For example, inventors have designed WMOBs to include electrical connections and dryer vent connections, as well as the plumbing connections.  WMOBs are also often designed to allow for various configurations and juxtapositions for all of these connections, such as placement of the two supply faucets on the top or the side of the WMOB, instead of the bottom.  Furthermore, plumbers often use WMOBs as a connection point for other home appliances that require a drain pipe, including air conditioners, water softeners, or swamp coolers.

Regarding this latter point, up until the 1980s, plumbers routinely connected drain lines from additional appliances to the WMOB by simply running the waste water hose from the appliance into the same drain port used by the washing machine.  In other words, plumbers would hook both the drain hose from the washing machine and the drain hose from the air conditioner into the same WMOB outlet hole.  In the 1990s, however, changes in municipal plumbing codes began to prohibit the sharing of a WMOB drain port by both a washing machine and another appliance.  Accordingly, plumbing supply manufacturers began to design WMOBs with two separate drain ports.

10

One example of such a design is shown below.  This illustration is a modified drawing of a dual-drain-port WMOB disclosed in U.S. Patent No. 6,125,881, which was issued in October of 2000 to LSP Products Group ("LSP").  As this illustration suggests, once the dual-drain-port WMOB is installed between the wall studs, a plumber must join each of the two drain ports to a single drain line, typically using various pieces of pipe to create a Y-shaped connector.



LSP's dual-drain-port  WMOB, U.S. Patent No. 6,125,881

11

Defendant IPS was one of the first large-scale manufacturers of WMOBs using injection-molded plastic, and IPS developed and patented a dual-drain-port WMOB as early as 1990.  A drawing from IPS's U.S. Patent No. 4,934,410 is shown to the right.  This WMOB is configured with two drain ports, each located toward the outer edge of the WMOB, in between which are located two centrally-placed supply line ports.



Like the LSP dual-drain-port WMOB shown on the previous page, IPS's WMOB required a plumber to use a series of pieces of pipe to create a Y-shaped connector, to join the two drain ports to a single drain line.  In fact, a plumber would often have to complete six or seven plumbing weld joints to complete these connections.    See  welds  numbered  in illustration at right.[3]



_____

[3]  This illustration is a modified drawing taken from page 2 of Oatey's claim construction brief.  See also '850 Patent, col. 1, lines 30-50 (describing the plumbing weld joints typically required to connect older models of dual-drain-port WMOBs to the building's drain pipe).

As for plaintiff Oatey, it obtained the '850 patent in November of 2000, one month after the '881 patent issued to LSP. The two drawings below, taken from Oatey's '850 patent, show two drain ports next to each other on one side of the WMOB, and two supply line ports next to each other on the other side of the WMOB. The two drain ports lead to a common "tailpiece," which is connected by a plumber to the building's drainage system. It is this "tailpiece," in combination with the two drain ports, that was the primary novelty disclosed in Oatey's patent. As Oatey explains, to connect other, prior dual-drain-port WMOBs to the building's drainage system, "a plumber was required to piece and weld together several different plumbing pipe sections to connect separate tailpieces leading from each drain [port]." Oatey's Constr. Br. at 1. In contrast, the configuration of the drain ports and tailpiece in the Oatey WMOB "greatly reduces the number of joints necessary to connect the washing machine hose drain port and the condensate line drain port to the drain pipe. For example, in the preferred [WMOB], only one joint is needed between the tailpiece outlet and the [building's] drain pipe to connect both drain ports to the drain pipe." '850 Patent, col. 2, lines 12-19. Thus, "Oatey's WMOB is considerably faster and less expensive to



FIG. 1

FIG. 2

install because it requires only a single weld." Oatey's Constr. Br. at 1. Put simply, plumbers found that Oatey's tailpiece, which connected to both of the WMOB drain ports, was an improvement over having to piece together a Y-shaped connector, to join the two drain ports to the drain line.

Oatey set out in its '850 patent the particularities of the structure and configuration of its novel WMOB tailpiece and the two drain ports. It is the interaction of this tailpiece structure and the drain ports that lie at the heart of the parties' dispute. To highlight the parties' dispute, the Court first identifies the critical points of <u>agreement</u>.

Shown on the next page are three modified drawings, taken from Oatey's patent. These three drawings show: (Fig. 3) the WMOB, together with the tailpiece; (Fig. 6) the bottom view of another piece, called a "test cap;" and (Fig. 2) the bottom wall of the WMOB, with the test cap installed. More particularly, figure 3 shows that the right side of the bottom wall of the WMOB has an "oblong or elongated opening **50** [that] is surrounded by a recess **60** in the top surface **62** of the bottom wall **34**."[4] The test cap shown in figure 6 fits into the recess **60** in the bottom wall. The test cap has "two frangible knockout portions **82** which, when removed, form the drain ports **54** and **56,**" as depicted in figure 2. These drain ports are each "sized to accommodate [a] washing machine drain hose."

Figure 3 also shows "the tailpiece **22**." This tailpiece may be either "integrally formed with the bottom wall **34**," or instead a separate piece "that is . . . solvent welded to the bottom wall." In

---

[4] The quoted language in this and the next few paragraphs of the opinion comes from various lines in the '850 Patent, cols. 4 & 5.

14

any case, the upper chamber of the tailpiece "contains a dividing wall or partition **72** that defines [two] passageways **24** and **26**." The top part of this dividing wall **76** is "trapezoidal-shaped" and it is designed to mate with the test cap. Thus, the bottom surface of the test cap (shown in figure 6) has several "downwardly extending webs, **88**, **90**, and **92**." The oblong shape of web **88** fits into the oblong opening **50** in the bottom wall of the WMOB. The central webs **92** are designed to meet and fit the top of trapezoidal-shaped partition **76** in the tailpiece. The circular webs **90** that surround the knockout portions are designed to form the drain ports, **54** and **56**.



FIG. 3



FIG. 6

These drawings illustrate how, in this embodiment of Oatey's invention, the test cap and tailpiece work together to form two separate passageways; each passageway has its own opening, or port



FIG. 2

15

that receives a drain hose from a washing machine or other appliance, and the two passageways then lead to a single drainpipe.  Importantly, the parties <u>agree</u> that the claim language of the '850 patent <u>does</u> encompass the embodiment illustrated and described above, where the test cap is welded into the bottom wall of the WMOB.

    B.  The Language of Oatey's Patent

Having described and illustrated its invention, Oatey made, among others, the following actual claims in its patent:

1.    A washing machine outlet box comprising a housing including a bottom wall, first and second juxtaposed drain ports in said bottom wall, and a common tailpiece for both of said drain ports extending from said bottom wall, said tailpiece extending completely around both of said drain ports in said bottom wall said tailpiece having an outlet for connection to a drain pipe.

2.    A washing machine outlet box as set forth in claim 1 wherein said tailpiece includes wall sections defining a first fluid passageway from said first drain port to said outlet and a second fluid passageway from said second drain port to said outlet.

3.    A washing machine outlet box as set forth in claim 1 wherein the said tailpiece is integrally formed with said bottom wall of said housing.

5.    A washing machine outlet box as set forth in claim 1 wherein said bottom wall of said housing has an elongated opening communicating with both of said drain ports, said tailpiece surrounding said elongated opening.

17.    A washing machine outlet box comprising a housing including a bottom wall, first and second juxtaposed drain ports in said bottom wall, and a common tailpiece for both of said drain ports extending from said bottom wall, said tailpiece having an outlet for connection to a drain pipe, said tailpiece including a chamber, and a dividing wall section within said chamber dividing said chamber into two passageways, one of said passageways providing fluid communication between said first drain port and said outlet, and the other of said passageways providing fluid communication between said second drain port and said outlet.

'850 Patent, cols. 6-8.

16

In the description of its invention, however, Oatey also described an alternative embodiment that did not feature the test cap.  Summarizing, Oatey stated that

> [t]he elongated opening in the bottom wall is preferably surrounded by a non-symmetrically shaped recess and the base portion of the test cap has the same non-symmetrical shape to insure that the test cap is properly positioned relative to the opening.  It may be noted, however, that if a test cap is not used, the oblong opening in the bottom wall (in conjunction with the tailpiece) may itself define the drain ports.

'850 Patent, col. 2, lines 25-33.

IPS insists that, regardless of what Oatey's specification discloses, Oatey did not actually claim an invention where a single oblong opening leading to a dual-chambered tailpiece acts as two separate drain ports.  Oatey, on the other hand, asserts that it simply acted as its own lexicographer and used the specification to explain that its invention did not depend upon use of a test cap, or of any structure that operates to separate the drain ports into distinct elements.

While the technology at issue in this case is quite simple, and the claim terms the Court is asked to construe are neither complex nor technical, resolution of the parties' dispute over those claim terms is not an easy task.  The parties' dispute is both timely and timeless.  It is timely because the Federal Circuit so recently addressed the role the specification plays in claim construction; it is timeless because neither Phillips, nor the many cases before it tackling the issue, can (nor does Phillips purport to) provide hard and fast rules to be applied in all cases.

Thus, while Oatey is correct that a patent holder may act as its own lexicographer and that, when it does, the definitions used in the specification must control how a claim is to be construed, IPS is also correct that it remains the law, even after Phillips, that the specification may not be used to rewrite the claims.  The question posed by this case is one neither posed by nor answered in

17

<u>Phillips</u>: how does one differentiate between language that constitutes disclosed but unclaimed subject matter in a patent and language that operates to define the subject matter that <u>is</u> claimed in the patent?

### C. Disputed Claim Term - "First and second juxtaposed drain ports"

Oatey asserts that the phrase "first and second juxtaposed drain ports" is clearly and explicitly defined in the specification of the Oatey Patent to mean "an opening *or portion of an opening* into a passageway for the flow of fluid." Parties' Jt. Cl. Constr. IPS argues that the phrase "first and second juxtaposed drain ports" means that the "ports" are "separate and distinct" openings that are adjacent or near each other - "not two portions of a single opening." Parties' Jt. Cl. Constr. IPS contends that the reference to an alternative embodiment in the specification cannot alter the meaning of what is actually claimed in the patent.

### 1. The Claim Language - Ordinary Meaning

As noted above, claim construction analysis begins with the claims themselves. <u>See</u> <u>CCS Fitness Inc. v. Brunswick Corp.</u>, 288 F.3d 1359, 1366 (Fed. Cir. 2002). The Court must give those terms the common and ordinary meaning one of ordinary skill in the art would afford them. <u>Id.</u> There is no suggestion that the phrase "first and second juxtaposed drain ports," or any of the individual terms used therein have any specialized meaning in the relevant art. Accordingly, and because the briefing in this matter occurred pre-<u>Phillips</u>, the parties first looked to dictionaries for definitions of the various words used in this disputed claim. In so doing, the parties agreed that common-use dictionaries, as opposed to technical dictionaries or treatises, were a fair starting point to determine the common meaning of the words employed in the patent. Especially in cases such as this, where the terms at issue are readily within the ken of a layman, <u>Phillips</u> neither prohibits the

18

use of dictionaries, nor counsels against reference to them as a first resort, which the Court now does.

The Merriam-Webster Online Dictionary defines "port" as: "2a: an opening (as in a valve seat or valve face) for intake or exhaust of a fluid; b: the area of an opening in a cylinder face of a passageway for the working fluid in an engine; also such as a passageway." *www.merriam-webster.com*.  Most notably, this definition does not state that a port can be a "portion" of a larger opening. While Oatey concedes that this definition is consistent with the common and ordinary meaning of the term "port" and that it does not expressly contemplate a "port" being a portion of some larger opening, it asserts that this definition also does not impose the "separate and distinct" limitations suggested by ISP. [5]

While Oatey may be correct in its reading of the dictionary, the "separate and distinct" limitations arise from other sources,  most particularly from the immediate context in which the term "port" is used.   As <u>Phillips</u> instructs, "the claims themselves provide substantial guidance as to the meaning of claim terms."  <u>Phillips</u>, 415 F.3d at 1314.  Thus, when construing claim terms,  it is appropriate to look to the context in which the claim term is used and the surrounding text. <u>Arlington Indust. v. Bridgeport Fillings</u>, 345 F.3d 1318, 1325 (Fed. Cir. 2003) (context of surrounding words must be considered in determining plain and ordinary meaning); <u>Hockerson-Halberstadt, Inc. v. Converse</u>,  Inc., 183 F.3d 1369, 1374 (Fed. Cir. 1999) (stating that claim construction requires "interpretation of entire claim in context, not a single element in isolation").

---

[5] Oatey also asserts that,  although the dictionary definitions do not state explicitly that a port can  be a "partial opening," the definition does not exclude it either. Oatey's Const. Br. At 14.  This argument is not particularly meaningful, however.  Most definitions fail to exclude multiple alternatives; the definition of a horse does not expressly exclude other animals, and the definition of a bed does not expressly exclude a chair, etc.  The important question is what a definition <u>includes</u> – by express inclusion or express exclusion.

Thus it is appropriate to also look at the ordinary meanings of the other words used in conjunction with the term port – i.e.,  "first," "second," and "juxtaposed" – and to examine the manner in which "port" is used in relation to the text surrounding that term.

The Federal Circuit has explained that use of "the terms 'first' and 'second' is a common patent-law convention to distinguish between repeated instances of an element or limitation." Free Motion Fitness v. Cybex International Inc., 423 F.3d at 1348 (quoting 3M Innovative Props. Co. v. Avery Dennison, 350 F.3d 1365, 1371 (Fed Cir. 2003)).  The dictionary definitions of the terms "first" and "second" also support the conclusion that use of those terms is intended to convey a multiplicity of the element modified by those words – in this case, the drain ports.  The Merriam-Webster Online Dictionary defines "first" as "preceding all others in time, order or importance" and "second" as "next to the first in place or time, one that is next after the first in rank." In the patent, the term "ports" is always preceded by the words "first," "second" or "both," again indicating distinct elements which are either discussed separately, or discussed collectively as two passageways, not as a portion of a whole.[6]

The fact that these first and second drain ports are described as "justxtaposed" to one another further supports the notion that they are separate elements, moreover.   "Juxtapose" means "to place side by side." *www.merriam-webster.com*.  There would be no need to define the ports as "side by side" if they were one and the same.  If the Court were to accept Oatey's proposition that the meaning of the term "ports" includes a "partial opening," the passageways could overlap at any point in the "oblong opening" referenced in the claims, rendering use of the term "juxtaposed"

---

[6] The Merriam-Webster Online Dictionary defines "both" as "being the two **:** affecting or involving the one and the other <both feet> <both his eyes>." *www.merriam-webster.com*.

meaningless.  The Court finds that the phrase "first and second juxtaposed drain ports," when read as a whole conveys to the reader – regardless of their level of skill in the art – that the patent claims two openings that are identifiable from one another.[7]

Other basic principles of claim construction support this conclusion, moreover.  Claim 1 provides for "first and second juxtaposed drain ports" as well as a "tailpiece extending completely around both of said drain ports."  Claim 5, which depends from claim 1, further provides for "an elongated opening communicating with both of said drain ports" and a "tailpiece" surrounding that "elongated opening."  Because the drain ports and the "elongated opening" are defined as acting in communication with one another, a person of ordinary skill in the art necessarily would view the terms "drain ports" and "elongated opening" as distinct elements; it would be nonsensical to describe the drain ports (or the "elongated opening") as "communicating" with themselves (or itself).  Because Oatey used different language, moreover, to describe the structure of the tailpiece surrounded, i.e., claim 1 states that the "tailpiece" extends around "both of said drain ports," while claim 5 states that the "tailpiece" surrounds the "elongated opening," there is a presumption that there is a difference in meaning between the two terms or phrases and, thus, that the tailpiece is surrounding different things in the two claims.  See Tandon Corp. v. United States Int'l Trade Comm'n., 831 F.2d 1017, 1023 (Fed. Cir. 1987) (noting that claim differentiation presumes a difference in meaning and scope when different words or phrases are used in separate claims). If the Court were to accept Oatey's position that "drain ports," as used in claim 1, are actually just portions

---

[7]  This conclusion is supported by reference to Oatey's own drawings.  Each pictorial referring to "ports" and every reference to "ports" is depicted by identifiable ports 54 and 56. ('850 Patent, col. 3, lines 61-63; col. 4, lines 2-5, 10-14, 26-30, 58-61; col. 5, lines 20-23, 30-34, 35-37, 45-47, 53-56.)

of the "elongated opening" of claim 5, the limitations in the two claims would be the same – *i.e.*, both claiming one oblong opening surrounded by a tailpiece through which fluid flows. That construction would mandate the conclusion that claim 5 is no narrower than claim 1, from which it depends. That result would impermissibly read one or the other of those claims out of existence. See Innova/Pure Water, Inc. v. Safari Water Filtration, 2004 U.S. App. LEXIS 16549 at *32 (Fed. Cir. August 11, 2004) (noting that dependent claims narrow independent claims).[8] Put simply, Oatey's invitation to read "first and second juxtaposed drain ports" and "elongated opening" as one and the same would require the Court to ignore significant aspects of Oatey's claim drafting.

        2. Oatey as its own lexicographer.

        Oatey asserts that, even if IPS's reading of the claim language were otherwise correct, the Court should ignore that reading and adopt Oatey's alternative construction for that language. This is so, Oatey claims, because Oatey asserts that it acted as its own lexicographer by defining the claim term "drain port" to be an "opening or a partial opening." Essentially, Oatey asserts that it used the specification to define away any "separate and distinct" character to the drain ports which use of the phrase "first and second juxtaposed drain ports" might otherwise convey.

        The specification in the '850 patent does state more than once that "it should be understood that the test cap 52 may be omitted and the oblong opening 50, in combination with the tailpiece 22,

---

[8] Oatey also resorts to the principle of claim differentiation in support of the proposed reading of the claims. Oatey asserts that IPS' proposed reading of claim 1 is too narrow, and limits claim 1 to the embodiment of the invention contemplated in dependant claim 6, where the drain ports are used in conjunction with a test cap. IPS's proposed reading of "first and second juxtaposed drain ports" in claim 1 as two separate passageways does not demand that those passageways be defined only by the test caps disclosed in claim 6, however. The passageways of claim 1 can be "separate" whether or not a test cap is used to define that separation.

may instead define the drain ports 54 and 56." '850 Patent, col. 4, lines 23-26.   While Oatey concedes that this language does not explicitly redefine the claim term "port" to mean a "partial opening," Oatey asserts that it did so by implication and the Court is bound by Oatey's description of its own invention.  Presumably, Oatey would contend that <u>Phillips</u>' emphasis on the importance of the specification to a proper reading of claim language lends further support to this argument.

Oatey's lexicographer argument has two prongs.  First, Oatey asserts that a patentee <u>can</u> be its own lexicographer by defining a claim term by implication, and second, that by defining an alternative embodiment of its invention, Oatey did just that – impliedly redefined the term "drain ports" as used in claim 1 to include a "partial opening" of a larger single structure.

It is true that a claim term may be redefined in a specification "by implication."  In <u>Bell Atlantic Network Services, Inc. v. COVAD Comm. Group, Inc.</u>, 262 F.3d 1258, 1268 (Fed. Cir. 2001), the Federal Circuit held that "[w]hen a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term "by implication.""  <u>Id.</u> at 1271.  In other words, the written description of the preferred embodiments "can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format."  <u>Scimed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.</u>, 242 F.3d 1337, 1344 (Fed. Cir. 2001). Following this principle, the Federal Circuit repeatedly has found that a claim term which appears otherwise broad on its face may be narrowed by implication where the specification makes clear that the patentee intended to give that term the narrower meaning.  <u>See</u>, <u>e.g.</u>, <u>Nystrom</u>**,** 424 F.3d at 1145 (concluding that the term board could not be afforded a broad meaning, despite support in dictionary for same, because specification consistently limited use of the term board to mean a <u>wood</u> board).

23

Accepting Oatey's initial legal proposition as true, however, does not require acceptance of Oatey's conclusion that the '850 fits within the bounds of that proposition.  Oatey neither used a definitional format within its specification (as it concedes) nor impliedly redefined the term drain ports through consistent and clear use of that term in the specification.  Notably, all of the cases upon which Oatey relies are cases where the Federal Circuit concluded that a careful reading of the specification mandated the conclusion that a claim term should be afforded a meaning which is narrower than the broadest dictionary definition or "ordinary meaning" which might otherwise attach to that term.  See Nystrom, 424 F.3d at 1145 (intrinsic record may narrow the range of "ordinary meanings" which may be afforded a particular claim term where it is clear no alternative meaning was contemplated); see also Aquatex Industries, Inc. v. Technical Solutions, 419 F.3d 1374, 1380 (Fed. Cir. 2005) (context of specification can make clear that patentee did not intend term to have broader meaning even where such broader meaning is not expressly disavowed).

Oatey has not cited this Court to a single case (and this Court has not found one) where the Federal Circuit relied on the specification to find an implied broadening of a claim term whose ordinary meaning is otherwise clear.  The absence of supportive case law is particularly telling, moreover, when one considers that Oatey not only seeks to broaden its chosen claim terms by reference to its specification, but seeks actually to rewrite them so as to exclude those chosen terms.

At the Markman hearing, Oatey conceded (as it did repeatedly in its brief) that, rather than redefine the term "ports," the specification disclosed alternative embodiments to the invention – one using "ports" and one not using "ports": "The patent defines specifically the drain ports to be one of two embodiments or two different embodiments." (Tr. at p.6).  Thus Oatey concedes that it is not asking this Court to use the specification to help it define the term "port," it is asking the Court to

24

read the term "first and second juxtaposed drain ports" out of the claims.  Essentially, Oatey argues that the Court should not import limitations from the chosen claim terms into the specification. While <u>Phillips</u> may have done much to raise the stature of the specification in the claim construction process, it did not go that far.  Indeed, as noted above, the exercise in which Oatey asks this Court to engage in is inconsistent with very basic principles of patent law, none of which have been changed by <u>Phillips</u>.  <u>See</u> <u>McClain v. Ortmayer</u>, 141 U.S. at 424 (specification may be referred to in order to limit a claim, but can never be relied upon to expand it.); <u>see</u> <u>also</u> <u>SRI International v.</u> <u>Matsushita Elec. Corp.</u>, 775 F. 2d 1107, 1121 n. 14 (Fed. Cir. 1985) ("Specifications teach. Claims claim.").

Oatey's position is similar to that of the patent holder in <u>Johnson v. Johnston</u>, *supra*, where the specifications recognized certain alternative forms of the invention, but the claims did not embody them.  The Federal Circuit concluded that patent holders must bear the cost of their own failure to seek protection for foreseeable alterations of their claimed structure. <u>Id</u>. at 1059.  Quite simply, acknowledgment of a possible alternative structure in the specification is not the same as <u>claiming</u> that alternative structure.  Oatey chose its claim language; it may not use its specification to now "imply" it out of existence.

Ultimately, the Court concludes that when Oatey claimed  "first and second juxtaposed drain ports," it claimed two separate identifiable physical elements that are adjacent or near each other.

25

The Court construes the claim language accordingly.[9]

### III. PROCEDURE

Having construed the critical claim term at issue, the Court must now determine infringement and validity.   The Court has previously extended the deadlines for discovery, expert reports, and dispositive motions, triggering those deadlines off of the issuance of this opinion.  If the parties believe that, with the benefit of the Court's construction of the patent claim language, a status conference and/ or settlement conference would be helpful or appropriate, they should contact the Court. Otherwise, the parties should adhere to the existing deadlines for discovery and exchange of expert reports.

**IT IS SO ORDERED.**

> **s/Kathleen M. O'Malley**
> **KATHLEEN McDONALD O'MALLEY**
> **UNITED STATES DISTRICT JUDGE**

**DATED: March 8, 2006**

_____

---

[9] While the parties' briefs debate the meaning of the terms "in said bottom wall" and "integrally formed", the parties did not address these terms at the Markman hearing and, as noted, conceded at the hearing that the Court's construction of the single term addressed in this opinion would resolve the parties' dispute.  Consistent with the principle that the Court is only to construe those terms whose meanings are in dispute, the Court does not address those additional two terms here.  See Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc., 200 F.3d 795, 803 (Fed. Cir. 1999) (explaining that "only those terms need be construed that are in controversy, and only to the extent necessary to resolve the controversy.") (citation omitted).  Should the parties deem it necessary to do so, the Court is prepared to issue a supplement to this Order addressing those terms.

26