# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | | |
|---|---|---|
| **OATEY COMPANY,** | : | **Case No. 03-CV-1231** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN M. O'MALLEY** |
| **v.** | : | |
| **IPS CORPORATION,** | : | **MEMORANDUM & ORDER** |
| **Defendant.** | : | |

Before the Court are several motions for summary judgment, including *Defendant's Motion for Summary Judgment Based on Invalidity* ("Invalidity MSJ") (Doc. 128), which was filed by the Defendants, IPS Corporation ("IPS") on January 9, 2009.[1]  IPS's Invalidity MSJ challenges the validity of Plaintiff Oatey Company's ("Oatey") patent, U.S. Patent No. 6,148,850 ("'850 Patent"), on various grounds.  For the reasons fully articulated below, IPS's Invalidity MSJ is **GRANTED** because the Court finds the '850 Patent invalid on obviousness grounds.  Accordingly, the other pending motions are **MOOT** and this case is **DISMISSED**.

---

[1]  The following motions for summary judgment are also pending: *Oatey's Motion for Summary Judgment of Infringement* (Doc. 127); *Defendant's Motion for Summary Judgment of Noninfringement* (Doc. 129); and *Defendant's Motion for Summary Judgment of Unenforceability and/or Adjudicating as without Controversy that Oatey is Estopped from Presenting Evidence to Swear Behind the LSP Patents* (Doc. 132).

## I.    **BACKGROUND**

The six-year history of this patent litigation features a *Markman* hearing, stipulated dismissal, a trip to the United States Court of Appeals for the Federal Circuit and back, and buffet-style motions for summary judgment complete with voluminous briefing and oral argument.  The patent at issue in this case, Oatey's '850 Patent, relates to an improvement to washing machine outlet boxes ("WMOB") that facilitates compliance with certain municipal plumbing codes and ease of installation.  In its *Markman* Opinion (Doc. 67, *Markman* Opinion) the Court provided the following detailed description of WMOB and the '850 Patent based on the parties' *Markman* briefs and oral argument:

A. Overview of the Invention.

The Court begins its analysis with an overview of the plumbing problems that the patented invention is directed at solving.  As anyone who has done their own laundry knows, a washing machine, during various points of its clothes-washing cycle: (1) receives hot and cold water; and (2) expels waste water.  The hot and cold water arrive via plumbing supply pipes contained in the building or house where the washing machine resides; the waste water is pumped out of the washing machine through a drain pipe or hose, which is connected to the drainage system of the same building.  In older homes, these supply and drain pipes are often not neatly grouped. For example, the washing machine's drain hose may simply expel the waste water into a large sink basin, which is itself connected to a drain in the floor.  The end points of the cold and hot water supply pipes (e.g., wall-mounted faucets) may be some distance from this drain, and the two faucets may not be situated closely together.  This arrangement is, at the very least, inelegant, and can make connection of a washing machine messy or difficult.

In contrast, relatively newer homes are frequently constructed with a built-in device known as a "washing machine outlet box" or "WMOB."  See illustration below.[2]  A fairly uncomplicated device, which was first invented in the 1950s, the WMOB is sized to fit between two wall studs, with the outer edge of the open-faced box flush with the wall.  The simplest WMOB generally has: (1) two inlet holes (usually 1" in diameter), which receive the hot and cold water supply pipes, and that hold the hot and cold water faucets to which the washing machine hoses connect; and

---

[2]  This illustration is a modified drawing taken from a 1974 U.S. Patent (No. 3,847,175).

-2-

(2) an outlet hole (usually 1½ or 2" in diameter), which is connected to the house drainage system in which the drain hose from the washing machine is hooked.  Thus, contained within the WMOB are all the connections necessary for the washing machine: the hot and cold supply pipe faucets, and also the drain connection.  This design allows for a clean and neat plumbing installation and simplifies a homeowner's effort to connect his washing machine.



While the simplest WMOB is essentially an open-faced box with three holes – two holes for supply pipes, and one hole for a drain pipe – inventors have created WMOB designs to accommodate various additional needs.  For example, inventors have designed WMOBs to include electrical connections and dryer vent connections, as well as the plumbing connections.  WMOBs are also often designed to allow for various configurations and juxtapositions for all of these connections, such as placement of the two supply faucets on the top or the side of the WMOB, instead of the bottom.  Furthermore, plumbers often use WMOBs as a connection point for other home appliances that require a drain pipe, including air conditioners, water softeners, or swamp coolers.

Regarding this latter point, up until the 1980s, plumbers routinely connected drain lines from additional appliances to the WMOB by simply running the waste water hose from the appliance into the same drain port used by the washing machine. In other words, plumbers would hook both the drain hose from the washing machine and the drain hose from the air conditioner into the same WMOB outlet hole.  In the 1990s, however, changes in municipal plumbing codes began to prohibit the sharing of a WMOB drain port by both a washing machine and another appliance. Accordingly, plumbing supply manufacturers began to design WMOBs with two separate drain ports.

-3-

One example of such a design is shown below.  This illustration is a modified drawing of a dual-drain-port WMOB disclosed in U.S. Patent No. 6,125,881, which was issued in October of 2000 to LSP Products Group ("LSP").  As this illustration suggests, once the dual-drain-port WMOB is installed between the wall studs, a plumber must join each of the two drain ports to a single drain line, typically using various pieces of pipe to create a Y-shaped connector.



LSP's dual-drain-port  WMOB, U.S. Patent No. 6,125,881

Defendant IPS was one of the first large-scale manufacturers of WMOBs using injection-molded plastic, and IPS developed and patented a dual-drain-port WMOB as early as 1990.  A drawing from IPS's U.S. Patent No. 4,934,410[, issued in 1990,] is shown [at left below].  This WMOB is configured with two drain ports, each located toward the outer edge of the WMOB, in between which are located two centrally-placed supply line ports.

Like the LSP dual-drain-port WMOB shown on the previous page, IPS's WMOB required a plumber to use a series of pieces of pipe to create a Y-shaped connector, to join the two drain ports to a single drain line.  In fact, a plumber would often have to complete six or seven plumbing weld joints to complete these connections.  See welds numbered in illustration at right [below].[3]

IPS '410 PATENT



_____

[3] This illustration is a modified drawing taken from page 2 of Oatey's claim construction brief.  See also '850 Patent, col. 1, lines 30-50 (describing the plumbing weld joints typically required to connect older models of dual-drain-port WMOBs to the building's drain pipe).

As for plaintiff Oatey, it obtained the '850 patent in November of 2000, one month after the '881 patent issued to LSP.  The two drawings below, taken from Oatey's '850 patent, show two drain ports next to each other on one side of the WMOB, and two supply line ports next to each other on the other side of the WMOB.  The two drain ports lead to a common "tailpiece," which is connected by a plumber to the building's drainage system.  It is this "tailpiece," in combination with the two drain ports, that was the primary novelty disclosed in Oatey's patent.  As Oatey explains, to connect other, prior dual-drain-port WMOBs to the building's drainage system, "a plumber was required to piece and weld together several different plumbing pipe sections to connect separate tailpieces leading from each drain [port]."  Oatey's Constr. Br. at 1.  In contrast, the configuration of the drain ports and tailpiece in the Oatey WMOB "greatly reduces the number of joints necessary to connect the washing machine hose drain port and the condensate line drain port to the drain pipe.  For example, in the preferred [WMOB], only one joint is needed between the tailpiece outlet and the [building's] drain pipe to connect both drain ports to the drain pipe."  '850 Patent, col. 2, lines 12-19.  Thus, "Oatey's WMOB is considerably faster and less expensive to install because it requires only a single weld."  Oatey's Constr. Br. at 1.  Put simply, plumbers found that Oatey's tailpiece, which connected to both of the WMOB drain ports, was an improvement over having to piece together a Y-shaped connector, to join the two drain ports to the drain line.



FIG. 1

FIG. 2

Oatey set out in its '850 patent the particularities of the structure and configuration of its novel WMOB tailpiece and the two drain ports.

. . .

B.  The Language of Oatey's Patent

Having described and illustrated its invention, Oatey made, among others, the following actual claims in its patent:

1.   A washing machine outlet box comprising a housing including a bottom wall, first and second juxtaposed drain ports in said bottom wall, and a common tailpiece for both of said drain ports extending from said bottom wall, said tailpiece extending completely around both of said drain ports in said bottom wall said tailpiece having an outlet for connection to a drain pipe.

2.   A washing machine outlet box as set forth in claim 1 wherein said tailpiece includes wall sections defining a first fluid passageway from said first drain port to said outlet and a second fluid passageway from said second drain port to said outlet.

3.   A washing machine outlet box as set forth in claim 1 wherein the said tailpiece is integrally formed with said bottom wall of said housing.

5.   A washing machine outlet box as set forth in claim 1 wherein said bottom wall of said housing has an elongated opening communicating with both of said drain ports, said tailpiece surrounding said elongated opening.

17.  A washing machine outlet box comprising a housing including a bottom wall, first and second juxtaposed drain ports in said bottom wall, and a common tailpiece for both of said drain ports extending from said bottom wall, said tailpiece having an outlet for connection to a drain pipe, said tailpiece including a chamber, and a dividing wall section within said chamber dividing said chamber into two passageways, one of said passageways providing fluid communication between said first drain port and said outlet, and the other of said passageways providing fluid communication between said second drain port and said outlet.

-7-

'850 Patent, cols. 6-8.

(*Markman* Opinion at 7-16.)   In this lawsuit, Oatey claims that IPS's competing WMOBs infringe all of these claims.  IPS denies it sells an infringing product and asserts that all of the asserted claims are invalid for a variety of reasons.

After the Court issued its *Markman* Opinion, Oatey concluded that it could not prove infringement if it was bound by the claim construction in that Opinion.  Given that conclusion, the parties stipulated to the entry of summary judgment in favor of IPS so that Oatey would have a final, appealable, Order, and IPS dismissed its invalidity contentions without prejudice.  (Doc. 82, Judgment Entry.) Oatey appealed to the Court of Appeals for the Federal Circuit, which vacated this Court's *Markman* Opinion, finding that, while its claim construction was correct in many respects, this Court had misconstrued one aspect of the claims at issue.  *Oatey Co. v. IPS Corp.*, 514 F.3d 1271 (Fed. Cir. 2008).  Specifically, the Federal Circuit concluded that this Court erred to the extent it concluded that its construction of claim 1 of the '850 Patent excluded the embodiment disclosed in Figure 3 of the patent.[4]

Upon remand, the Court established a Case Management Plan.  At the Case Management Conference, the Court ordered IPS to file a notice specifically identifying any invalidity defenses it intended to assert.  (Doc. 90, Case Management Plan.)  IPS complied, identifying the anticipation

---

[4] Among other things, this Court relied on claim differentiation principles to conclude that the presence of the dividing wall and fluid passageway language in claims 2 and 17, but not in claim 1, implied that reference to those same elements to define the existence of the separate "juxtaposed drain ports" in claim 1 would be inappropriate.  The Federal Circuit rejected this conclusion, citing *Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987), for the proposition that "claims may cover the same subject matter in different words," and holding that "[a]lthough the term 'first and second juxtaposed drain ports' defines distinct openings, this does not exclude the distinct openings formed as shown in the structure of Figure 3[,]" "whereby the ports are formed using a dividing wall provided by a tailpiece."  *Oatey*, 514 F.3d at 1277-78.

and obviousness arguments it asserts by way of the Invalidity MSJ now before the Court, as well

as the inequitable conduct and public policy arguments it raised in its unenforceability motion.

(Doc. 110, Brief Defining Invalidity Arguments.)  In addition, the parties conducted discovery and

filed the motions for summary judgment that are now pending.[5]

Although each of the motions for summary judgment addresses a potentially dispositive

issue, the motions addressing invalidity and unenforceability present threshold issues that are best

resolved prior to any infringement analysis.  Further, because the Court concludes that IPS's

Invalidity MSJ is well-taken, it is not necessary to analyze the unenforceability motions and, in the

interest of judicial economy, the Court declines to do so.[6,7]  Likewise, although IPS's Invalidity MSJ

---

[5]  The pending motions are actually <u>cross</u>-motions for summary judgment on invalidity, unenforceability, and infringement grounds, respectively.  The parties agreed to combine the briefing on their motions, however.

[6]  Of note, based on the briefing and oral argument on this issue, as well as certain post-hearing discovery and supplemental briefing, were the Court to rule on the unenforceability motions, it would likely find that summary judgement is <u>not</u> appropriate with respect to inequitable conduct.  The Court's preliminary conclusion is that, although Oatey's counsel failed to disclose material prior art (as that term is defined in the context of the applicable duty of disclosure), there are material issues of fact with respect to whether there was an intent to deceive the Patent and Trademark Office in connection therewith.

[7]  Oatey argues that the Federal Circuit addressed and resolved the validity of the '850 Patent in its review of this Court's *Markman* Opinion.  The Court rejects this argument.  While validity of the patent was raised at various points in the oral argument, the Federal Circuit alluded to this issue only once in its opinion.  *Oatey Co.*, 514 F.3d 1271.  It stated as follows:

> IPS states that inclusion of Figure 3 in the scope of claim 1 would encompass the prior art, which shows a single drain port; this argument requires the construction that Figure 3 shows a single drain port.  However, Figure 3 shows the structure whereby the two juxtaposed drain ports are formed, and the claims require two drain ports; we discern no merit to the argument that including Figure 3 in claim 1 would include prior art.

(Doc. 87 at 10.)  Celebrating the semi-colon, this paragraph avoids making any determination with respect to validity.  The Federal Circuit simply concluded that because Figure 3 does <u>not</u> show a single drain port, Figure 3 does not encompass prior art that discloses <u>only</u> a single drain

is premised upon both anticipation pursuant to 35 U.S.C. § 102 and obviousness pursuant to 35 U.S.C. § 103, the Court does not address its anticipation finding (rejecting a portion of IPS's argument and declining to address another) in detail because it concludes that IPS has met its burden with respect to obviousness.[8]  Accordingly, the Court turns to IPS's obviousness arguments in its Invalidity MSJ.

## II.    DISCUSSION

### A.    THE LEGAL STANDARD FOR A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions and provides in pertinent part:

> The judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(c); *see also Vita-Mix Corp. v. Basic Holding, Inc.*, — F.3d —, 2009 WL 2950226, *3 (Fed. Cir. Sept. 16, 2009).  This standard applies in patent cases just as it does in other areas of law.  *Nike, Inc. v. Wolverine World Wide, Inc.*, 43 F.3d 644, 646 (Fed. Cir. 1994).

---

port.  Nowhere does the Federal Circuit say that it conducted an analysis of IPS's obviousness claim/defense.  Indeed, it would be remarkable for the Federal Circuit to fully analyze an issue as to which no record was made at the district court level and which both parties agreed should be dismissed without prejudice prior to appeal.  (*See*, *e.g.*, Doc. 55, *Markman* Hearing Tr. at 18-20, where Oatey's counsel confirmed his belief that the District Court should not address validity at the claim construction stage.)  And, since the Federal Circuit decision in this case predated *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007), Oatey certainly cannot claim the Federal Circuit resolved any issue under that now-governing standard.

[8]  As noted below at note 20, the Court finds that the first cited reference in support of IPS's anticipation argument – the Traylor '964 – does not, in fact, contain all elements of any of the asserted claims of the '850 Patent.  In addition, because the question of whether the second cited reference – the Hobbs '881 is actually prior art depends, in large measure, on IPS's inequitable conduct claim, and that claim appears laden with material factual disputes, the Court declines to decide that aspect of IPS's anticipation MSJ.

-10-

In reviewing summary judgment motions, this Court must view the evidence in a light most favorable to the non-moving party to determine whether a genuine issue of material fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970); *Ball Aerosol & Specialty Container, Inc. v. Limited Brands, Inc.*, 555 F.3d 984, 991 (Fed. Cir. 2009); *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008). A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Determination of whether a factual issue is "genuine" requires consideration of the applicable evidentiary standards. Thus, in most civil cases, the Court must decide "whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict." *Id.* at 252.

Upon filing a motion for summary judgment, the moving party has the initial burden of establishing that there are no genuine issues of material fact as to an essential element of the non-moving party's claim. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479-80 & n.12 (6th Cir. 1989). The moving party, however, is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the moving party relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

In response, if the moving party establishes the absence of a genuine issue of material fact, to defeat summary judgment, the non-moving party "may not rely merely on allegations or denials in its own pleading; rather, its response must – by affidavits or as otherwise provided in this rule – set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). In this regard, "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment;" rather, "Rule 56 allocates that duty

-11-

to the opponent of the motion, who is required to point out the evidence, albeit evidence that is already in the record, that creates an issue of fact." *Williamson v. Aetna Life Ins. Co.*, 481 F.3d 369, 379-80 (6th Cir. 2007) (citation omitted).  Moreover, the non-moving party must show more than a scintilla of evidence to overcome summary judgment; it is not enough for the non-moving party to show that there is some metaphysical doubt as to material facts. *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87; *Vita-Mix*, — F.3d —, 2009 WL 2950226 at *3.

Accordingly, the ultimate inquiry is whether the record, as a whole, and upon viewing it in the light most favorable to the non-moving party, could lead a rational trier of fact to find in favor of the non-moving party.  *Id.*; *see also Anderson*, 477 U.S. at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [non-moving party] is entitled to a verdict – whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.") (emphasis in original) (internal quotations omitted); *Amgen, Inc. v. F. Hoffman -LA Roche Ltd.*, — F.3d —, 2009 WL 2928763, *7 (Fed. Cir. Sept. 15, 2009).

In its Invalidity MSJ, IPS argues that claims 1, 2, 3, 5, and 17 of the '850 Patent are obvious in light of prior art.  (Invalidity MSJ at 1.)  To prevail on this argument, IPS must establish that, construing the facts in the light most favorable to Oatey, there is no genuine issue of material fact and it is entitled to judgment as a matter of law that the '850 Patent is invalid under the applicable law of obviousness.

### B.    THE LEGAL STANDARD FOR OBVIOUSNESS

#### 1.    The Requirement of Nonobviousness for Patentability

A patent cannot be infringed unless it is valid, *i.e.*, the invention at issue must satisfy the requirements of patentability.  35 U.S.C. § 282.  Invalidity is, thus, an affirmative defense to a patent infringement lawsuit.

One of the statutory requirements of patentability is nonobviousness. The Patent Act does not confer patent protection on an invention

> if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103(a); *see also Proctor & Gamble Co. v. Teva Pharm. USA, Inc.*, 566 F.3d 989, 994 (Fed. Cir. 2009).   The United States Supreme Court clearly articulated the rationale for the nonobviousness requirement of 28 U.S.C. § 103(a) in *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007):

> We build and create by bringing to the tangible and palpable reality around us new works based on instinct, simple logic, ordinary inferences, extraordinary ideas, and sometimes even genius. These advances, once part of our shared knowledge, define a new threshold from which innovation starts once more. And as progress beginning from higher levels of achievement is expected in the normal course, the results of ordinary innovation are not the subject of exclusive rights under the patent laws. Were it otherwise patents might stifle, rather than promote, the progress of useful arts. *See* U.S. Const., Art. I, § 8, cl. 8. These premises led to the bar on patents claiming obvious subject matter established in *Hotchkiss* and codified in § 103. Application of the bar must not be confined within a test or formulation too constrained to serve its purpose.

Section 103 thus codifies one of the fundamental principles underlying the policy the framers intended to advance by including patent protection in the Constitution.

-13-

### 2.      The Test for Obviousness

A properly issued patent is presumed valid.  35 U.S.C. § 282; *see also AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1238-39 (Fed. Cir. 2003).  A party seeking to invalidate a patent based on obviousness must prove by clear and convincing evidence "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Proctor & Gamble, Co.*, 566 F.3d at 994 (quoting *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1361 (Fed. Cir. 2007)).  Evidence is clear and convincing when the factfinder has "an abiding conviction that the truth of [the] factual contentions are highly probable." *Id.* (quoting *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984)).

Furthermore, obviousness is a question of law to be determined based on underlying factual considerations.  *Ball Aerosol*, 555 F.3d at 991 ("Obviousness under 35 U.S.C. § 103 is a question of law, with underlying factual considerations regarding (1) the scope and content of the prior art, (2) the differences between the prior art and the claimed invention, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations.").

### a.      The *Graham* Analysis

To evaluate obviousness, the Court must conduct a four-pronged inquiry into the following underlying factual considerations identified by the Supreme Court in *Graham v. John Deer Co.*, 383 U.S. 1, 17-18 (1966):

> (1) the scope and content of the prior art;
> (2) the differences between the prior art;
> (3) the level of ordinary skill in the art; and
> (4) any relevant secondary considerations.

*Ball Aerosol*, 555 F.3d at 991 (citing *Graham*, 383 U.S. at 17-18).  The *Graham* analysis is designed

to provide the factual basis necessary to address the question set forth in § 103(a) — whether the invention "would have been obvious at the time [it] was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103.

In *KSR*, the Supreme Court analyzed obviousness in the summary judgment context and explained the interplay between the ultimate legal determination and the analysis of the *Graham* factors:

> The ultimate judgment of obviousness is a legal determination.  *Graham*, 383 U.S. at 17 . . . .  Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.

550 U.S. at 427; *see also Ball Aerosol*, 555 F.3d at 993 (quoting *KSR*); *Tokyo Keiso Co., Ltd. v. SMC Corp.*, 307 Fed. Appx. 446, 450 (Fed. Cir. Jan. 9, 2009) (same).  Accordingly, the Court must first evaluate each of the *Graham* factors, construing the disputed, material facts in the light most favorable to the non-moving party, Oatey.  Then, after making findings based on the facts so construed, the Court must determine whether, as a matter of law, IPS has submitted clear and convincing evidence "that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *Proctor & Gamble, Co.*, 566 F.3d at 994 (omitting quotation and citation); *see generally* Peter S. Menell, *et al.*, *Patent Case Management Guide*, Berkeley Center for Law & Technology, University of California at Berkeley School of Law § 6.2.1.1.1 (2008).

### b.    The TSM Test Is Informative, Not Mandatory

Once the Court has conducted the *Graham* analysis to set the factual stage, it must determine whether, as a matter of law, the invention is obvious or patentable. *Graham*, 383 at 17-18 ("Against

-15-

this background the obviousness or nonobviousness of the subject matter is determined.").  Prior to the Supreme Court's decision in *KSR*, the Federal Circuit applied the "teaching/suggestion/motivation" ("TSM") test in making this determination.  *See Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.*, 411 F.3d 1332, 1337 (Fed. Cir. 2005).  Under the TSM test, "a patent claim is only proved obvious if some motivation or suggestion to combine the prior art teachings can be found in the prior art, the nature of the problem, or the knowledge of a person having ordinary skill in the art."  *KSR*, 550 U.S. at 407 (omitting citation and internal quotations).  In *KSR*, the Supreme Court clarified the appropriate use of the Federal Circuit's TSM test – as a "helpful insight" but not a "rigid and mandatory formula[ ]."  *Id*. at 419.

### c.       The Governing *KSR* Approach to Determining Obviousness

*KSR* provides lower courts with clear guidance regarding the ultimate determination of obviousness.  Because *KSR* articulates significant explanations and clarifications of the law and standards applicable to the lower courts' obviousness determinations, the Court will discuss it in detail and highlight several of the key instructions before applying those principles to the facts at bar.

### i.       Expansive/Flexible/Functional

First, the Supreme Court in *KSR* explained that its prior decisions dictate that courts use an approach that is "expansive," "flexible," or "functional" as opposed to formulaic.  *Id*. at 415.  "To this end, *Graham* set forth a broad inquiry and invited courts, where appropriate, to look at secondary considerations that would prove instructive."  *Id*. (citing *Graham*, 383 U.S. at 17).  In describing this flexible approach, the Supreme Court noted that, although "[a] factfinder should be aware, of course, of the distortion caused by hindsight bias" in evaluating obviousness, the proper approach must allow for "recourse to common sense[.]" *Id*. at 421 (quoting *DyStar Textilfarben,*

-16-

*GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1367 (2006), noting that the Federal Circuit's prior precedent "not only permits, but *requires*, consideration of common knowledge and common sense").

### ii.     Combinations of Prior Art to Achieve Predictable Results

Second, *KSR* emphasizes the importance of disallowing patents for combinations of elements found in prior art which merely yield a predictable result. The purpose of this prohibition is to avoid stifling innovation by "diminish[ing] the resources available to skillful men." *Id*. at 416 (quoting *Great Atl. & Pac. Tea Co. v. Supermarket Equip. Corp.*, 340 U.S. 147, 152 (1950) and concluding that "[t]he combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Accordingly, to prove obviousness, a defendant must show that, at the time of the invention, a known problem existed "for which there was an obvious solution encompassed by the patent's claims." *Id*. at 420. In other words, a designer is not entitled to patent protection for solving an apparent problem by virtue of an apparent solution to achieve a predictable result. The Supreme Court thus instructed courts to "ask whether the improvement is more than the predictable use of prior art elements according to their established functions[,]" and to "look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *Id*. at 417-18.[9]

---

[9] Since *KSR*, the Federal Circuit has applied the known problem/predictable result principle in finding invalidity on obviousness grounds. *See*, *e.g.*, *Agrizip, Inc. v. Woodstream Corp.*, 520 F.3d 1337 (Fed. Cir. 2008) (characterizing a case involving an improvement to a rodent trap as a "textbook case of when the asserted claims involve a combination of familiar elements according to known methods that does no more than yield predictable results.").

As a corollary to the known problem/predicable result principle, in determining whether the problem and solution are apparent, the Court should not focus narrowly on the specific field of endeavor in which the invention exists or artificially narrow the awareness and creativity of the person of ordinary skill in the art. "Common sense teaches . . . that familiar items may have obvious uses beyond their primary purposes, and in many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle. . . . A person of ordinary skill is also a person of ordinary creativity, not an automaton." *KSR*, 550 U.S. at 420-21.

The Supreme Court further explained that a person of ordinary skill in the art may find predictable solutions in analogous fields of endeavor; a designer who interrelates prior art from other fields within the scope of the designer's skill is not entitled to patent protection for the combination.

> When a work is available in one field of endeavor, design incentives and other market forces can prompt variations of it, either in the same field or a different one. If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.

*KSR*, 550 U.S. at 417.  Combinations of prior art, moreover, may be obvious even in the absence of extensive discussion of the technique in industry literature.  As the Supreme Court instructed:

> In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.

*Id*. at 419.

*KSR* clearly cautions against insisting upon a strict correlation between the specific field of endeavor and the relevant prior art.  This does not make all prior art relevant, however.  As the

-18-

Federal Circuit has reiterated since *KSR*, there must be a logical relationship between prior art in a different field and the problem facing the designer.

> 'A reference is reasonably pertinent if, even though it may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem.' *In re Clay*, 966 F.2d 656, 659 (Fed. Cir.1992). In other words, 'familiar items may have obvious uses beyond their primary purposes.' *KSR* . . ., 550 U.S. 398 . . . . We therefore have concluded, for example, that an inventor considering a hinge and latch mechanism for portable computers would naturally look to references employing other 'housings, hinges, latches, springs, etc.,' which in that case came from areas such as 'a desktop telephone directory, a piano lid, a kitchen cabinet, a washing machine cabinet, a wooden furniture cabinet, or a two-part housing for storing audio cassettes.' [*In re*] *Paulsen*, 30 F.3d [1475,] 1481-82 [(Fed. Cir. 1994)].

*In re ICON Health & Fitness, Inc.*, 496 F.3d 1374, 1379-80 (Fed. Cir. 2007).

### iii.      The Factfinder's Analysis Must Be Explicit

Third, the Supreme Court specifically instructed courts to articulate their analysis explicitly "[t]o facilitate review," although "the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id*. at 418.  Therefore, while the motivation to combine elements of prior art may be <u>implicit</u> in that prior art such that a person of ordinary skill in the art would easily perceive the desirability of the combination, the <u>Court</u> must <u>explicitly</u> identify that motivation in its analysis of obviousness.  *See Ball Aerosol*, 555 F.3d at 988-89.

### iv.      "Obvious to Try"

Fourth, the Supreme Court clarified that it is possible to prove obviousness by showing "that the combination of elements was 'obvious to try.'" *Id*. at 421 (omitting citation).  As explained by the Supreme Court:

-19-

> When there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*Id.*[10]

The Federal Circuit has since discussed the "obvious to try" doctrine in a number of cases. *See*, *e.g.*, *Bayer Schering Pharma AG v. Barr Labs., Inc.*, – F.3d –, 2009 WL 2385095, at *5 (Fed. Cir. Aug. 5, 2009); *Ball Aerosol*, 555 F.3d at 991-92; *In re Kubin*, 561 F.3d 1351, 1358-60 (Fed. Cir. 2009). For example, the Federal Circuit recently provided a detailed and instructive analysis of the "obvious to try" doctrine in *In re Kubin*, 561 F.3d at 1358-60. In that case, the Federal Circuit noted that its own authority presaged *KSR*'s discussion of the "obvious to try" doctrine by describing when the fact that a combination was "obvious to try" would <u>not</u> invalidate a patent. *Id.* (citing *In re O'Farrell*, 853 F.2d 894, 903 (Fed.Cir.1988)). Specifically, prior to *KSR*, the Federal Circuit had explained that the "obvious to try" doctrine <u>cannot</u> invalidate a patent when:

> what would have been "obvious to try" would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful.

*In re O'Farrell*, 853 F.2d at 903. As the Federal Circuit explained in *In re Kubin*, the *O'Farrell* insights still apply after *KSR*:

> [W]here a defendant merely throws metaphorical darts at a board filled with combinatorial prior art possibilities, courts should not succumb to hindsight claims of obviousness. The inverse of this proposition is succinctly encapsulated by the

---

[10]    In expressly *endorsing* the "obvious to try" alternative, the Supreme Court said it was reversing the Federal Circuit, which, in one case, had expressly *rejected* it, noting that it "has long been held not to constitute obviousness." *Id.* at 414 (quoting 119 Fed. Appx. 282, 289 (Fed. Cir. 2005) (quoting *In re Deuel*, 51 F.3d 1552, 1559 (Fed. Cir. 1995))).

Supreme Court's statement in *KSR* that where a skilled artisan merely pursues 'known options' from a 'finite number of identified, predictable solutions,' obviousness under § 103 arises. 550 U.S. at 421, 127 S.Ct. 1727.

*In re Kubin*, 561 F.3d at 1359.  Similarly, "obvious to try" does <u>not</u> invalidate a patent when

what was "obvious to try" was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it.

*Id.* (quoting *O'Farrell*, 853 F.2d at 903).  "Again, *KSR* affirmed the logical inverse of this statement by stating that § 103 bars patentability unless 'the improvement is more than the predictable use of prior art elements according to their established functions.'" *Id.* (quoting *KSR*, 550 U.S. at 417.); *see also Barr Labs.*, 2009 WL 2385095, at *5.

Thus, *KSR* marks a departure from, or, at least, a clarification of, prior precedent regarding obviousness.[11]  The Supreme Court's endorsement of the "obvious to try" doctrine is illustrative of the overall effect of *KSR*, which was to broaden and strengthen the nonobviousness requirement of patentability.[12]

---

[11]  Notwithstanding its arguably rigid application of the TSM test in *KSR* itself, prior to *KSR*, the Federal Circuit had expressed an intention to apply the TSM test in a flexible, expansive manner.  *See, e.g.*, *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1291 (Fed. Cir. 2006) ("There is flexibility in our obviousness jurisprudence because a motivation may be found implicitly in the prior art.  We do not have a rigid test that requires actual teaching to combine before concluding that one of ordinary skill in the art would know to combine the references."); *Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.*, 464 F.3d 1356, 1361 (Fed Cir. 1999) (collecting cases illustrating the flexible approach and stating that "[i]n contrast to the characterization of some commentators, the suggestion test is not a rigid categorical rule.  The motivation need not be found in the references sought to be combined, but may be found in any number of sources, including common knowledge, the prior art as a whole, or the nature of the problem itself.").  Accordingly, *KSR* perhaps should be interpreted more accurately as clarifying an existing standard, rather than announcing a new one.

[12]  Similarly, the restrictive effect of *KSR* on patentability is apparent in the Supreme Court's instruction to use the TSM test as a guide rather than a standard, *see KSR*, 550 U.S. at 419-21, and its clear indication that lower courts should be less concerned about avoiding

-21-

### d. The Relative Importance of Secondary Considerations

To complete the *Graham* analysis, the Court must evaluate secondary considerations, also known as "objective evidence of nonobviousness." *Graham*, 381 U.S. at 17-18; *Ruiz v. A.B. Chance Co.*, 234 F.3d 654, 667 (Fed. Cir. 2000) (holding that district court erred in failing to consider evidence of secondary considerations). That is, after examining the prior art, comparing it to the claims at issue, and defining ordinary skill in the art, "a court may consider secondary objective evidence of non-obviousness, such as commercial success, long felt but unresolved need, failure of others, and the like."[13] *Id.* KSR did not change this; the Supreme Court noted that "*Graham* set forth a broad inquiry and invited courts, where appropriate, to look at any secondary considerations that would prove instructive." 550 U.S. at 415 (citing *Graham*, 381 U.S. at 17).

It is, nonetheless, necessary to understand the relative importance of secondary considerations in the overall obviousness analysis. *Graham* and *KSR* qualify the role of secondary considerations to some extent: in *Graham*, the Supreme Court said that the court "*may*" consider secondary considerations, 383 U.S. at 17, and it confirmed this approach in *KSR* by stating that *Graham* had "invited" courts to consider secondary considerations "where appropriate." *KSR*, 550 U.S. at 415. Although courts have <u>not</u> interpreted this language as making secondary considerations an optional step in the obviousness analysis, *see Sud-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001, 1008 (Fed. Cir. 2009) (citing *Ruiz,* 234 F.3d at 667 and instructing district court to consider secondary considerations on remand, as failure to do so may constitute error), the Federal Circuit

---

hindsight analysis and more concerned about permitting common sense to inform the obviousness determination, *see id.* at 421.

[13] Courts have also identified unexpected results, praise, and copying as examples of other relevant secondary considerations. *See, e.g., Sud-Chemie, Inc. v. Multisorb Techs., Inc.*, 554 F.3d 1001, 1008 (Fed. Cir. 2009).

has repeatedly stated that secondary considerations cannot generally overcome a strong *prima facie*

showing of obviousness.[14]  *See, e.g., Rothman v. Target* Corp., 556 F.3d 1310, 1322 (Fed. Cir. 2009)

---

[14]  Although the term "*prima facie*" generally connotes a burden-shifting analysis, the Federal Circuit does not use it in that way.  In *Pfizer, Inc. v. Apotex, Inc.*, the Federal Circuit addressed this issue as follows:

> Since we must presume a patent valid, the patent challenger bears the burden of proving the factual elements of invalidity by clear and convincing evidence. That burden of proof never shifts to the patentee to prove validity. *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1375 (Fed.Cir.1986). "The presumption [of validity] remains intact and [the burden of proof remains] on the challenger throughout the litigation, and the clear and convincing standard does not change." *Id.*

> It is true that once a challenger has presented a *prima facie* case of invalidity, the patentee has the burden of going forward with rebuttal evidence. *See Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1216 (Fed.Cir.1998) (citing *Hybritech*, 802 F.2d at 1376); *Cable Elec. Prods. Inc. v. Genmark, Inc.*, 770 F.2d 1015, 1022 (Fed.Cir.1985) ("[I]f evidence is presented establishing a *prima facie* case of invalidity, the opponent of invalidity must come forward with evidence to counter the *prima facie* challenge to the presumption of section 282."). But, all that means is that even though a patentee never must submit evidence to support a conclusion by a judge or jury that a patent remains valid, once a challenger introduces evidence that might lead to a conclusion of invalidity-what we call a *prima facie* case-the patentee "would be well advised to introduce evidence sufficient to rebut that of the challenger." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed.Cir.1986).

> However, this requirement does not "in substance shift the burden of persuasion," *Cable Elec.*, 770 F.2d at 1022, because "the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation." *Mas-Hamilton Group*, 156 F.3d at 1216; *see also Innovative Scuba Concepts, Inc. v. Feder Indus.*, Inc., 26 F.3d 1112, 1115 (Fed.Cir.1994); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 287 (Fed.Cir.1985). The trial court has the responsibility to determine whether the challenger has met its burden by clear and convincing evidence by considering the totality of the evidence, including any rebuttal evidence presented by the patentee. *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983).

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359-60 (Fed. Cir. 2007) (omitting footnotes); *see also Scanner Techs. Corp. v. ICOS Vision Sys. Corp. N.V.*, 528 F.3d 1365, 1380 (Fed. Cir. 2008)

(citing *Leapfrog Enters, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) and stating that "a strong *prima facie* obviousness showing may stand even in the face of considerable evidence of secondary considerations."); *Boston Scientific Scimed, Inc. v. Cordis Corp.*, 554 F.3d 982, 991-92 (Fed. Cir. 2009); *Tokyo Keison*, 307 Fed. Appx. at 453.  In fact, the Federal Circuit articulated this rule in *Leapfrog*, the first obviousness case it decided after *KSR*.  *Leapfrog*, 485 F.3d at 1162 (affirming the district court's finding that, despite "substantial evidence of commercial success, praise, and long-felt need, . . . given the strength of the *prima facie* obviousness showing, the evidence on secondary considerations was inadequate to overcome a final conclusion [of obviousness]").

## C.    ANALYSIS

The Court concludes that Oatey's '850 Patent is invalid on obviousness grounds.  To explain this conclusion, the Court will proceed through the factual inquiries described in *Graham*, as informed by *KSR* and its progeny, and in light of the standards applicable to a motion for summary judgment.  That is, since obviousness is a legal determination for the Court, the question is whether, construing the facts relating to the underlying *Graham* factors in the light most favorable to Oatey, there is a genuine issue of material fact as to one or more of those factors sufficient to preclude the legal determination of obviousness.  *KSR*, 550 U.S. at 427.[15]

### 1.    The Level of Ordinary Skill in the Art is Undisputed

First, the level of ordinary skill in the art is undisputed.  According to Oatey's expert, a

---

(quoting *Pfizer, Inc.*).

[15]  Of course, in reaching this conclusion, the Court does and must keep in mind the burdens that apply at trial – *i.e.*, while the patentee has an incentive to produce evidence of secondary considerations, the burden of persuasion remains with IPS and it is a burden of proof by clear and convincing evidence.  *See Amgen, Inc.*, — F.3d —, 2009 WL 2928763, at *17.

person of ordinary skill in the art for purposes of this case "would typically be a master plumber with several years of practical experience in the field or an engineer with at least an undergraduate engineering degree and several years of experience designing or developing plumbing supply products." (Invalidity MSJ at 26 (quoting Ex. K, Expert Report of Ronnie Jackson at 12).) IPS does not object to this description of the level of ordinary skill in the art for purposes of their Invalidity MSJ.[16]  The Court finds, moreover, that Mr. Jackson's description of the level of ordinary skill in the art is reasonable based on the now extensive record before it regarding this invention.

### 2.       The Scope & Content of the Prior Art

#### a.       The Definition of Prior Art in the Obviousness Context

In general, "prior art" in the obviousness context is "technology already available to the public." *See OddzOn Products, Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1402 (Fed. Cir. 1997) (quoting *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437, 1453 (Fed.Cir.1984)).  Thus, prior art essentially amounts to the publically available material described in the novelty provision of the Patent Act, § 102(a), (e), (g), and (f).  *See id.*; *see also Mass Eng'd Design, Inc. v. Ergotron, Inc.*, — F. Supp. 2d —, 2009 WL 1035205, at *3 (E.D. Tex. Apr. 17, 2009); *Trading Techs. Intern., Inc. v. GL Consultants, Inc.*, No. 05 C 4120, 200WL 1468552, at *2 (N.D. Ill. May 16, 2007); *cf. Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1305 (Fed. Cir. 2006) (citing *Riverwood Int'l Corp. v. R.A. Jones & Co.*, 324 F.3d 1346, 1354 (Fed.Cir.2003)).  The material described in these provision of § 102 includes patents and printed publications of all kinds available to the public prior to the date of the invention at issue, as well as prior use or knowledge that occurred in the United

---

[16]  In fact, IPS argues that it favors their position with respect to obviousness because it describes a highly skilled plumber or plumbing engineer who likely possesses substantial knowledge, skill, and creativity.

States before the date of the invention.  *See* 35 U.S.C. § 102.

Further, as discussed above, prior art relevant to the obviousness inquiry is not strictly limited to the specific field of endeavor of the invention at issue, but extends to fields logically related to the general problem facing the inventor.  *See In re ICON Health & Fitness*, 496 F.3d at 1379-80 (citing *In re Clay*, 966 F.2d 656, 659 (Fed. Cir. 1992); *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006); *In re Paulsen*, 30 F.3d 1475, 1481-82 (Fed. Cir. 1994); *Hitachi Koki Co., Ltd. v. Doll*, 620 F. Supp. 2d 4, 19-20 (D.D.C. 2009) ("Where an inventor is considering how to design a particular mechanism to fit a specific type of device, he 'would naturally look to references employing' other forms of that mechanism, even where they are found in different types of devices."(omitting citations and quotations)); *cf. KSR*, 550 U.S. at 420 ("[F]amiliar items may have obvious uses beyond their primary purposes.").  The nature of the problem defines the scope of the prior art a person of reasonable skill in the art would consult in attempting to solve it.

  **b.**  **The Scope of the Claims as Construed by this Court and the Federal Circuit**

At the *Markman* stage of this case, the parties asked the Court to construe just one term of claim 1 of the '850 Patent: "first and second juxtaposed drain ports." *Oatey Co. v. IPS Corp.*, 2006 WL 581240, at *8, n.9 (N.D. Ohio Mar. 8, 2006).  Applying the applicable principles of claim construction, the Court concluded "that when Oatey claimed 'first and second juxtaposed drain ports,' it claimed two separate identifiable physical elements that are adjacent or near each other." The Court expressly rejected Oatey's argument that Oatey had implicitly redefined the term "drain

ports" to include a "partial opening" of a larger single structure by including an alternative embodiment in its specifications. *Id*. at *11. The Court reasoned that "acknowledgment of a possible alternative structure in the specification is not the same as <u>claiming</u> the alternative structure. Oatey chose its claim language; it may not use its specification to now 'imply' it out of existence." *Id*. at *12. As noted previously, moreover, in response to Oatey's request for clarification regarding the effect of its *Markman* Order on the embodiment disclosed in Figure 3, the Court concluded that, because claims 2 and 17 contained language <u>not</u> found in claim 1, which specifically claimed a "dividing wall" in the tailpiece whose function was to create "fluid passageways" designed to "communicate with" the separate drain ports referenced in claim 1, that dividing wall could not serve as the structure which also created the separate drain ports claimed there. Again, as noted above, the Federal Circuit rejected that



FIGURE 3 – '850 PATENT

aspect of this Court's analysis, agreeing with Oatey that the separate drain ports of claim 1 could be formed by separating a larger opening in the bottom wall with the dividing wall of the tailpiece.

Specifically, the Federal Circuit noted that it "normally do[es] not interpret claim terms in a way that excludes embodiments disclosed in the specification . . . [unless] those embodiments are clearly disclaimed in the specification . . . or prosecution history . . . ." *Oatey*, 514 F.3d at 1276-77. After finding that the alternative embodiment depicted in Figure 3 of the '850 Patent was <u>not</u>

disclaimed, the Federal Circuit held that that embodiment "was improperly excluded from the scope

of claim 1." *Id*. at 1277 (stating that: "The recitation in claim 1 that the drain ports are in the bottom

wall does not exclude the Figure 3 embodiment whereby the ports are formed using a dividing wall

provided by the tailpiece.  In Figure 3 the juxtaposed drain ports are defined by the perimeter of the

oblong opening in conjunction with the dividing wall.").  Accordingly, the Federal Circuit altered

this Court's construction as follows:

> Although the term "first and second juxtaposed drain ports in said bottom wall"
> defines distinct openings, this does not exclude the distinct openings formed as
> shown in the structure of Figure 3.  The district court erred in construing claim 1 as
> excluding this embodiment.  The claim construction is modified accordingly.

*Id*. at 1277-78.

### c.      Summary of the Parties' Arguments

IPS has submitted a relatively broad set of patents, printed publications, and knowledge in

the industry for the Court's consideration in support of their argument that the '850 Patent is

obvious.  First, IPS directs the Court to numerous patents.  Some of the patents reveal the historical

evolution of WMOBs -- from the pre-WMOB era, to single-drain-port systems, to dual-drain-port

systems, and, ultimately, dual-drain-port systems employing a common tailpiece.  *See* U.S. Pat. Nos.

2,884,947 (1959) ("Gerhardt '947"); 3,096,782 (1963) ("Williams '782"); 3,834,781 (1974)

("Logsdon '781"); 4,410,004 (1983) ("Kifer '004"); 4,934,410 (1990) ("Humber '410"); 5,592,964

(1997) ("Traylor '964"); 6,125,881 (2000) ("Hobbs '881").  Other patents to which IPS refers the

Court relate generally to methods of combining multiple streams of effluent into a single outlet.  *See*

U.S. Pat. Nos. 3,476,852 (1969) ("Shattuck '852"); 4,815,274 (1989) ("Piatti '274"); 5,216,883

(1993) ("Flugger '883"); *see also* Gerhardt '947.  In addition, IPS refers the Court to the Southern

Nevada 1997 Plumbing Code Amendments as an example of changes in regulatory standards that

affect the design requirements of WMOBs.  (Invalidity MSJ, Exs. H-I.)[17]  Finally, IPS directs the Court to Gerhardt '947, which discloses a funnel-shaped tailpiece at the bottom of a divided wash basin that extends completely around the drain ports on each side of the basin.  IPS argues that Gerhardt '947 demonstrates that the use of similar funnel-shaped "adaptors," "manifolds," or "tailpieces" was common knowledge in the plumbing and engineering field as a method of combining multiple streams of effluent into a single outlet.

Oatey disagrees with IPS's description of the relevant prior art in two ways.  First, Oatey argues that the patents relating to methods of combining effluent streams in automobile exhaust systems are too far afield to be considered.  Second, Oatey specifically contends that the Hobbs '881 Patent is *not* prior art.  Neither of these asserted factual disputes preclude summary judgment, however.

### d.    Discussion of the Scope & Content of the Prior Art

The history of WMOBs is set forth above.  Without repeating it here, the Court will highlight certain aspects of it in order to tie that history to the prior art submitted by IPS and to clearly articulate the scope and nature of the prior art in the context of the obviousness inquiry.  Upon full consideration of the parties' arguments and submissions, the Court finds as follows with respect to the first *Graham* consideration.

---

[17]  Section 804.1 of the Southern Nevada 1997 Plumbing Code Amendments adds the following language to the Code:

> When any discharge piping other than the discharge from the wash machine is terminated in the washer box, an additional or second port washer box shall be used for all other terminations, *i.e.*, condensate, water softener brine, T & P discharge.

(Doc. 129-10.)

The history of WMOBs is not in dispute.  Since the 1950s WMOBs have been commonly installed in homes to accommodate all of the plumbing connections and outlets associated with a washing machine in one neat and tidy box that fits between the two studs in a wall.  The pre-WMOB approach is demonstrated above by Fig. 1 of a 1959 patent, Gerhardt '947, which shows a washing machine [A] that drains waste water [27] into a large basin [B] over an open drain in the floor.  A typical early WMOB design is illustrated at right by Fig. 5 of a 1963 patent, Williams '782, which shows a WMOB with hot and cold water faucets [23, 24] in the bottom



GERHARDT '947 – FIG. 1



WILLIAMS '782 -- FIG. 5

wall on either side of a single drain port [52] attached to a drain pipe [25], and an opening in the top wall to accommodate at least one source of waste water from a washing machine and/or appliance such as an air conditioner.  In designs like Williams '782, the waste water drains through a single port in the bottom wall, even if the source of the effluent comes from multiple appliances.  Thus, the effluent streams are co-mingled at the bottom wall and are not separated there or for any distance in the tailpiece.

The parties do not dispute that changes to plumbing codes in certain regions of the country in the 1990s required a separate drain port for each different source of waste water.  The Southern Nevada 1997 Plumbing Code Amendments referenced by IPS provide an example of this requirement, and fall within the definition of prior art since they are in a printed publication that was available to the public prior to the invention of the '850 Patent.  A WMOB design like Williams '782 would be non-compliant in a jurisdiction with a plumbing code like Southern Nevada's if a plumber wanted to use it to drain more than one appliance – *i.e.*, Williams does not provide the "additional or second port" for "discharge piping other than the discharge from the wash machine[.]" (Doc. 129-10.)

The problem presented by the new plumbing codes was solved by new WMOB designs adding an additional drain port to accommodate each source of waste water entering the WMOB.  Such a



HUMBER '410 – FIG. 5

design is illustrated below in Fig. 5 of IPS's 1990 patent, Humber '410, which shows two drain ports [57, 67], one on each side of the bottom wall of the WMOB, separated by the adjacent hot and cold water faucets [21, 19].  Comparing Fig. 5 in Williams '782 (1963) to Fig. 5 in Humber '410 (1990), the latter includes the extra drain port, which addresses the requirements of the plumbing codes.

As explained in detail above, however, the design reflected in Humber '410 requires a plumber to use multiple connections between pipes below the WMOB to combine the effluent from the two drain ports before the streams flow out of a single drain pipe.  These connections are illustrated by numbers 1-6 in the figure to the bottom right.  In fact, throughout this litigation, Oatey has been clear that this was the problem it set out to solve, and did solve by virtue of the '850 Patent.  The solution, illustrated by Fig. 1 of Oatey's '850 Patent, was to (1) place the drain ports next to each other and (2) use a "tailpiece" [22] that extends completely around both drain ports [24, 26] to combine separate streams of waste water flowing out of the WMOB through each separate drain port.  LSP used the same solution around the same time, as reflected



OATEY'S '850 PATENT – FIG. 1



FIGURE SHOWING (6) CONNECTIONS

below in Figs. 8-10 of the '881 Patent.[18]



LSP '881 PATENT–FIG. 8-10

IPS has, accordingly, submitted prior art identifying the source and development of the problem the '850 Patent seeks to address: *i.e.*, an improvement over prior WMOBs that simplifies the combination of multiple streams of effluent from multiple drain ports to facilitate both compliance with plumbing codes and ease of installation.

Oatey contends that automobile exhaust systems are not within the scope of the prior art. Oatey does not submit any testimony or evidence in support of this contention; instead, Oatey argues that IPS has not satisfied its burden to submit clear and convincing evidence demonstrating that exhaust systems *are* analogous prior art.  In light of the problem to be solved, the Court finds that the patents IPS referenced relating to automobile exhaust systems that combine multiple sources of effluent into one outlet are prior art in the context of the obviousness analysis. First, although Oatey

_____

[18] LSP filed the application for the '881 Patent less than two weeks before Oatey filed the application for the '850 Patent.  Even accepting, as it must for summary judgment purposes, that the '881 Patent is not prior art, its existence remains relevant to the narrative of how this problem was solved in the industry.

correctly assigns the burden of producing clear and convincing evidence of invalidity to IPS, the exhaust system patents IPS submits are themselves evidence.  And, again, the person of ordinary skill in the art in this case is "a master plumber with several years of practical experience in the field or an engineer with at least an undergraduate engineering degree and several years of experience designing or developing plumbing supply products."  The proper question, therefore, is whether a reasonable juror could conclude that a master plumber or an experienced plumbing engineer would be inclined to consider the various methods of combining streams of effluents used in other fields of endeavor to determine the best way to do so in a WMOB.  As the Federal Circuit stated in *In re ICON Health & Fitness*, 496 F.3d at 1379-80, " even though [automobile exhaust systems] may be in a different field from that of the inventor's endeavor, it is one which, because of the matter with which it deals [*i.e.*, ways of combining multiple streams of effluent], logically would have commended itself to an inventor's attention in considering his problem."  Consequently, Oatey's contention that the automobile exhaust system patents are not prior art because "you [would not] hire a plumber to fix your car's combustion engine" misses the mark.  (Opp'n to Invalidity MSJ at 15.)  Recalling that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton[,]" *KSR*, 550 U.S. at 420-21, the Court finds that no reasonable juror could conclude that the exhaust system patents IPS submits are not prior art.[19]

---

[19]  In the alternative, even if the Court were to find that IPS has not submitted sufficient evidence in support of its contention that automobile exhaust systems are analogous prior art, the scope of the prior art would still include the prior art within the plumbing industry (*see e.g.*, Gerhardt '947, Traylor '964) that discloses methods of combining multiple streams of effluent. The Court's obviousness determination – a legal issue – would still be compelled by an examination of the prior art IPS submits except for the exhaust system patents. As discussed below, using a partition in a single tail piece to separate effluent streams was a predictable solution to the problem addressed by the '850 Patent given the known elements in the plumbing industry prior art.

### 3. Comparison of the '850 Patent & Prior Art

The next consideration under *Graham* is comparison of the '850 Patent to the prior art.

#### a. Humber '410 Compared to the '850 Patent

The undisputed historical development of prior art relating to WMOB discussed above establishes a relatively consistent single drain port design, *e.g.*, Williams '782. The dual-drain-port design exemplified by Humber '410 coincides with, and responds to, amendments to plumbing codes requiring a separate drain port for each source of waste water. In the dual drain port era, comparing the 1990 Humber '410 Patent to Oatey's '850 Patent is particularly instructive because both patents teach two drain ports, reflecting the state of the art in the industry at that time.[20] Thus, there are two meaningful differences between Humber '410 and Oatey's '850 Patent. First, the '850 Patent teaches adjacent or "juxtaposed," drain ports; Humber '410 does not. Second, the '850 Patent teaches a common tailpiece extending completely around the drain ports to combine the two separate streams of waste water flowing through the drain ports; Humber '410 does not.

#### b. Traylor '964 Compared to the '850 Patent

Oatey vigorously opposes the idea that Traylor '964 is a dual-drain-port system, and submits the expert testimony of Mr. Jackson in support of this argument. (Opp'n Br. at 10, Ex. D.) Therefore, construing the facts in the light most favorable to Oatey, the Court accepts Oatey's

---

[20] The parties expend considerable effort debating the alleged similarities between the '850 Patent and Traylor '964, in the context of IPS's argument that Traylor '964 <u>anticipates</u> the claims of the '850 Patent. Among the issues debated is whether Traylor '964 discloses two drain ports in the bottom wall. IPS says it does, Oatey says it does not. Oatey argues, persuasively, that inserting two hoses into a <u>single</u> opening in the bottom wall does not create <u>two drain ports in</u> that bottom wall. Because the Court agrees with Oatey's argument on this particular point, the Court finds that Traylor '964 is an example of a single-drain-port system which did not anticipate the '850 Patent. While it is part of the general body of prior art the Court may consider in the obviousness analysis, the Court does not find that Traylor '964 contains all elements of any of the '850 Patent claims at issue here.

contention that Traylor '964 is a single-drain-port system.  Nonetheless, Traylor '964 bears important similarities to the double-drain-port system of the '850 Patent.  Traylor '964 teaches a single drain port, but that drain port is configured such that two independent streams of waste water flow into the drain port, each from a different pipe or hose inserted into the drain port.  In this manner, the two independent streams of waste water are directed toward a single outlet and combined just below the circumferential lip of the drain port.  Although it is a single drain port system, as IPS points out repeatedly, Traylor '964 uses a tube or hose to divide the drain port and maintain the separation between the two streams of waste water until each is inside the drain port, below the circumferential lip of the drain port.  Therefore, the point at which the separate streams of waste water are combined is similar in Traylor '964 and the '950 Patent.  The difference is that Traylor '964 substitutes the end of the tube or hose for the drain port in the '850 Patent, and the drain port itself for the tailpiece in the '850 Patent.

As noted above, this distinction precludes IPS from proving that Traylor '964 anticipates the '850 Patent; but the similarities between the '850 Patent and Traylor '964 reveal a similar approach to solving the problem of satisfying the plumbing codes requiring the WMOB to separate streams of waste water until they reach the pipe directly connected to the home's drainage system.  Figures 9, 11, 12, and 13 illustrate the drain port in Traylor '964.



TRAYLOR '964 – FIGURE 9



TRAYLOR '964 – FIGURE 11



-37-   TRAYLOR '964 – FIGURES 12 & 13

c.      **Comparison of Prior Art Relating to the Common Tailpiece**

With respect to the common tailpiece, the 1959 Gerhardt '947 Patent is noteworthy because it discloses a funnel-shaped tailpiece extending completely around two drain ports in the bottom of a wash basin connected to a washing machine.  This tailpiece is similar to the '850 Patent's tailpiece in both its design and function.  It is also the simplest example of the prior art IPS submits in support of its argument that, <u>decades</u> before the '850 Patent,  use of a funnel-shaped "adapter," "manifold," or "tailpiece" was a well-known technique for combining multiple streams of effluent into one outlet.  Indeed, the funnel-shaped tailpiece disclosed in Gerhardt '947 physically resembles the '850 Patent's tailpiece, is generally in the plumbing field, and has two openings from the basin which drain into it.[21]

Oatey argues that Gerhardt '947 does not disclose a structure designed for a WMOB and does not appear to contain any structure that continues to separate the effluent streams for any distance beyond the bottom wall.  It is undisputed that Gerhardt '947 is not a WMOB.  Furthermore, construing the facts in the light most favorable to Oatey, the Court assumes that Gerhardt '947 does not disclose a divider of any kind below the bottom wall, *i.e.*, within the tailpiece itself.  Accordingly, the Court will consider Gerhardt '947 only for the technology it <u>undisputedly</u> discloses: a tailpiece completely extending around two drain ports in a bottom wall to combine two independent streams of effluent.

In addition, as discussed above, the Court finds that the adaptors and manifolds disclosed in the automobile exhaust systems IPS references address the same problem – how to combine multiple

---

[21]  Indeed, at the *Markman* Hearing, counsel for Oatey stated that the common tailpiece feature is the inventive aspect of the WMOB design disclosed by the '850 Patent: "So the feature here that they sought to patent is the fact that we have a common tailpiece which assists the plumber in making a very simple installation of the product."  (Tr., *Markman* Hrg. at 5.)

streams of effluent from different sources into a single outlet.  Clearly, these references were intended to address the concerns expressed in the '850 Patent.[22]  Therefore, those patents are comparable to the common tailpiece disclosed in the '850 Patent, in function and design.  For example, Piatti '274 discloses a tailpipe that merges separate streams of exhaust into a single outlet. Figure 8 of Piatti '274, below, illustrates an exhaust system for a four-cylinder internal combustion engine.  The purpose of the invention is to provide an exhaust system that increases the power and efficiency of the engine by maintaining a single exhaust channel for each of the four cylinders for as long as possible before combining the exhaust from all four channels in a single outlet **13**.  *See* Piatti '274, col. 1-2.  As described in the specifications:



FIGURE 8 – PIATTI '274

---

22  In fact, Oatey does not argue that the exhaust systems are dissimilar structurally or functionally, it simply argues that they are outside the field of endeavor.

> To this end the invention consists in an exhaust system for a multi-cylinder internal combustion engine including a plurality of individual primary exhaust tubes or channels leading from different exhaust ports and connected at their outlet ends into the inlet end of a common tailpipe, characterized in that the common tailpipe is divided by a partitioning wall or walls extending at least part-way along the tailpipe from its inlet end into two or more channels with which the outlet ends of the individual primary exhaust tubes or channels are connected separately or in pairs.

Piatti '274 col. 2, lns. 22-32.  For purposes of the obviousness analysis, the multiple "exhaust ports" formed by the partitioning walls **14**, **15** at the inlet end of the exhaust system correspond to the multiple drain ports in the bottom wall of the WMOB disclosed in Figure 3 by the '850 Patent.  The tailpipe **13** in Piatti '274 corresponds to the common tailpiece in the '850 Patent in that the multiple steams of effluent (exhaust or waste water) flowing through the separate ports (exhaust or drain) are combined there.  Piatti '274, moreover, discloses a dividing wall within the tailpiece.

### c.    Analysis

Based on the comparison of the prior art (construed in the light most favorable to Oatey) to the '850 Patent, the issue is whether the two key differences between the '850 Patent and the prior art – *i.e.*, placing the drain ports side-by-side and using a funnel-shaped common tailpiece to combine multiple streams of effluent – are obvious in light of the prior art under the flexible, common sense approach described in *KSR*.  The Court concludes that IPS has shown clearly and convincingly that the '850 Patent is invalid as obvious under the "obvious to try" doctrine approved and discussed in *KSR*.

In *KSR*, the Supreme Court established that the Court may find a patent invalid because it was "obvious to try" when (1) the problem to be solved arises out of a design need or market pressure; (2) the solution to the problem involves a finite number of identified and predictable solutions; (3) a person of ordinary skill in the art would have good reason to pursue the known options within his or her technical grasp; and (4)  such pursuit leads to the anticipated success.  *KSR*,

550 U.S. at 421.

The '850 Patent meets each of these criteria.  First, as explained by Oatey, the '850 Patent was inspired by a design need – *i.e.*, a dual-drain-port WMOB that plumbers could install without having to perform numerous welds to connect the WMOB drain ports to the building's plumbing. Addressing this problem was the motivation to combine elements of prior art.

Second, this situation is aptly described as involving "a problem [for which] there are a finite number of identified, predictable solutions;" those options were well-within the grasp of a master plumber or plumbing supply engineer; and pursuing them led to the anticipated success.  A WMOB is literally a small box containing a few distinct elements, in particular, hot and cold water faucets and two drain ports which must be connected to an outlet of some kind.  The problem is how to rearrange those elements to make it possible to combine the streams of effluent flowing through each of the drain ports in a manner that simplifies the connection between the WMOB and the building's drainage system.  Humber '410 positions all four elements in the bottom wall of the WMOB. Therefore, the '850 Patent, which also positions all four elements in the bottom wall of the WMOB, involves minimal re-arranging of the elements – it slides the faucets to one side and moves one drain port to a middle position.  Re-arranging the faucets and drain ports was an identified solution because prior art illustrates various arrangements of these elements.[23]  For example, Williams '782

---

[23]  At oral argument, IPS's counsel's used a computer presentation to visually demonstrate how the elements of Humber '410 can be re-arranged to match the orientation of the elements in the '850 Patent.  Oatey contended that this admittedly visually striking performance was an attempt to pass-off attorney argument as clear and convincing evidence that it would have been obvious to a person of ordinary skill in the art to re-arrange the elements of a WMOB to realize Oatey's design.  This is a red herring.  The evidence IPS submitted consists of the prior art it references.  It is this evidence that the Court considers in determining whether IPS has met its burden on summary judgment.  IPS's attorneys, like all other attorneys, presented arguments, complete with a fancy demonstrative exhibit, attempting to explain how they satisfy their burden based on this evidence.

-41-

shows alternative embodiments of a single drain port WMOB: in one embodiment (Fig. 1, below), the faucets are in opposite walls of the box and the drain port is in the center of the bottom wall and, in the alternative embodiment (Fig. 5, below), the faucets are on either side of the drain port in the bottom wall.

 

WILLIAMS '782 – FIG. 1                    WILLIAMS '782 -- FIG. 5

Similarly, using a funnel-shaped tailpiece was a well-established solution (*see* Gerhardt '947; Piatti '274) to a known and basic problem of engineering – *i.e.*, directing multiple streams of effluent toward a single outlet.  This is true even if the scientific and technical literature includes little discussion of this technique because it is so apparent based on common sense and fundamental principles of design that would be elementary to one of ordinary skill in the art.  *See KSR*, 550 U.S. at 419 ("In many fields it may be that there is little discussion of obvious techniques or combinations . . . .").  The number of alternative arrangements of these elements is both finite and predictable considering the size of the space inside the box, the small number of elements involved, the

-42-

simplicity of the elements involved, and, generally, the purpose and function of a WMOB.  Although

there are certainly multiple ways to re-arrange the elements (such as, *e.g.*, moving the faucets from

the bottom wall so that the drain ports are adjacent in the bottom wall), the arrangement depicted

in the '850 Patent and Hobbs '881 is one of the predictable solutions to the problem of facilitating

a simple and cost-effective method of connecting the WMOB to the building's drainage system.

Traylor '964 (Figs. 12 and 13 below right) also indicates that that the "obvious to try doctrine" applies in this case. Although, based on the facts construed in the light most favorable to Oatey, it does not anticipate the '850 Patent because of the differences in the configuration of the bottom wall and the fact that the tailpiece is divided into two drain ports by inserting tubes and hoses rather than a built-in dividing wall, Traylor '964 discloses a



TRAYLOR '964 – FIGURES 12 & 13

-43-

closely related solution to the same problem. Simply put, putting two tubes in a hole is not materially different from dividing that hole with a partition. Both the '850 Patent and Traylor '964 are WMOBs that accommodate two streams of effluent that are kept independent for some distance below the bottom wall of the box and are then co-mingled within



FIG. 3

the tailpiece. In fact, Figure 3 of the '850 Patent (right) illustrates these similarities. The drain ports **24** and **26** are defined by the dividing wall or partition **72** and the perimeter of the single opening **50** in the bottom wall that surrounds both drain ports. The dividing wall **72** bisects the space within the single opening **50**. This single opening corresponds to the single drain port in Traylor '964 **122**, and the dividing wall corresponds to the adjacent walls of the hose **128** and tube **70** inserted into the single drain port **122**. The hose and tube serve the same purpose as the diving wall – they divide the space inside the drain port. In each patent, moreover, the separate steams of effluent are allowed to co-mingle in the tailpiece below the bottom wall, after maintaining independent channels for a short distance within the tailpiece. Thus, if one were to take three horizontal cross-sections of both tailpieces at three different points along the tailpiece – at the bottom wall, slightly below the bottom wall, and below the respective dividers – the elements would correspond. In the bottom wall cross-section, the streams of effluent would be independent, separated by a divider of material – either the dividing wall **72** in the '850 Patent or the walls of the hose and tube in Traylor '964. The cross-

-44-

section slightly below the bottom wall would show the same configuration.  In the cross-section below the divider and below the end of the hose and tube, the streams of effluent would be co-mingled within the tailpiece.  Accordingly, although Traylor '964 is distinguishable for anticipation purposes, these distinctions are not controlling in the obviousness context.  In fact, Traylor '964 discloses one of the finite number of  identified, predictable solutions to the problem of separating streams of effluent into the tailpiece of a WMOB.

This is <u>not</u>, moreover, one of the situations described by the Federal Circuit where the "obvious to try" doctrine is inappropriate.  *See Barr Labs.*, — F.3d —, 2009 WL 2385095, at *5; *In re Kubin*, 561 F.3d 1358-60.  Specifically, re-arranging two faucets and two drain ports in a WMOB does not require the inventor to "vary all parameters" or engage in an extensive trial-and-error process without any indication from prior art concerning which combination(s) would be successful.  *In re Kubin*, 561 F.3d at 1359 (quoting *O'Farrell*, 853 F.3d at 903).  The inventor of the '850 Patent was not "merely throwing metaphorical darts at a board filled with combinatorial prior art possibilities . . . ."  *Id.*  Likewise, re-arranging the pertinent elements in the WMOB was not an exploratory exercise in a "promising field of experimentation, where the prior art gave only general guidance . . . ."  *Id.*  The re-arrangement was, instead, inspired by the desire to address a specific problem raised by the amendments to the plumbing codes, the solution to which involved "the predictable use of prior art elements [(*e.g.*, Williams '782, Humber '410, Traylor '964, Gerhardt '947, Piatti '274)] according to their established functions."  *KSR*, 550 U.S. at 417.

Although regulations establishing certain industry standards do not <u>necessarily</u> render a particular method of satisfying those standards obvious to try, *see Abbott Labs. v. Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008), a regulation that directs designers to a particular solution may render that solution obvious, *see Erico Intern. Corp. v. Vutec Corp.*, 516 F.3d 1350, 1356 (Fed. Cir.

-45-

2008).  For example, in *Erico*, the Federal Circuit found a substantial question of obviousness based on the combination of prior art and industry standards.  The invention at issue was a hook for hanging telecommunications cables, and the Electronics Industries Alliance ("EIA") and Telecommunications Industry Association ("TIA") standards established certain spacing standards for such hooks.  In finding that these standards supported its obviousness finding, the Federal Circuit stated that:

> It is reasonable to see that downwardly flared flanges coupled with the EIA spacing requirements could implicitly motivate a person of ordinary skill to use J-Hooks with the EIA spacing to achieve cable sag of no more than about 30 centimeters.

*Id*. at 1356 (citing *KSR*, 550 U.S. at 421; *DyStar Textilfarben GmbH v. C.H. Patrick Co.*, 464 F.3d 1356, 1368 (Fed.Cir.2006) ("[T]here exist[s] an implicit, indeed common-sensical, motivation to combine the two references.")); *see also Richardon-Vicks, Inc. v. Upjohn Co.*, 122 F.3d 1476, 1484 (Fed. Cir. 1997) (finding knowledge of impending FDA approval of ibuprofen as an over-the-counter drug an important motivation to use ibuprofen in a combination pain reliever drug).  Similarly, here, the plumbing codes require independent drain ports, which would implicitly motivate one of ordinary skill in the art – a master plumber or plumbing supply engineer – to recognize the need to combine the waste water flowing through each drain port, and to use the well-established, common-sensical funnel-shaped tailpiece method to address that need.

Lastly, Oatey argues that claims 2 and 17 of the '850 Patent "require the tailpiece of the WMOB to have separate wall sections, and none of the analogous art cited by IPS discloses or suggests such a tailpiece."  (Opp'n Br. at 18.)  In other words, Oatey argues that the analogous prior art does not include independent fluid passageways below the bottom wall within the tailpiece.  Oatey concedes, however, that its argument hinges on whether automotive exhaust systems are analogous prior art.  First, the Court has determined that no reasonable juror could conclude that the

-46-

exhaust system patents IPS submits are not analogous prior art under the applicable standard. Therefore, Oatey's argument with respect to claims 2 and 17 fails at the outset.  Second, even if the exhaust systems are not prior art, construing the facts in the light most favorable to Oatey, the Court has already found that Traylor '964 discloses a WMOB in which the independent effluent streams are kept separate for some distance below the bottom wall.  Accordingly, to the extent that this extended separation is even a valid distinction between claims 2 and 17 and claim 1 (see below), it is sufficiently present in the analogous prior art to make its structure obvious to those versed in that art.  Third, as also noted above, Gerhardt '947 discloses a single tailpiece surrounding two openings in a bottom wall; adding a dividing wall to the tail piece in response to plumbing codes requiring a separation of the effluent streams is a logical, common-sense adjustment to that prior art.  Finally, as explained above in footnote 4, even if exhaust systems are not prior art, the Federal Circuit effectively abolished any distinction between claim 1 and claims 2 and 17 by stating that

> claims 2 and 17 do not restrict the construction of claim 1.  It is not necessary to decide the meaning of 'fluid passageways' in these subsidiary claims in order to construe claim 1.  *See Tandon Corp. v. United States Int'l Trade Comm'n*, 831 F.2d 1017, 1023 (Fed. Cir. 1987) (explaining that there is a presumption of difference in scope among a patent's claims, but claims may cover the same subject matter in different words).

*Oatey*, 514 F.3d at 1277.  If claims 1, 2, and 17 cover the "same subject matter in different words," then claims 2 and 17 are obvious in light of the legal determination that claim 1 is obvious.[24]

### 4.    Secondary Considerations

Oatey's strongest arguments relate to secondary considerations, *i.e.*, objective evidence of nonobviousness.  Essentially, Oatey argues as follows:

---

[24]  Oatey does not even argue that the minor variations in the other independent claims would not have been obvious additions to the advancement in the art disclosed in claim 1.

> Logic dictates that if Oatey's design were merely an obvious and natural progression of a WMOB in light of plumbing codes as IPS suggests, IPS would have developed its infringing box years earlier and would not have been forced to copy Oatey's widely successful product to avoid losing customers to Oatey.

(Opp'n to Invalidity MSJ at 18.)  Oatey presents some unrebutted evidence that (1) the commercial embodiment of the '850 Patent – "The Eliminator®" – is a successful product; (2) the problem it addressed lingered for almost a decade after the first amendment to the plumbing codes and before the '850 Patent issued; and (3) IPS's (allegedly infringing) WMOB is remarkably similar to the '850 Patent, suggesting that IPS copied Oatey's WMOB.[25]

Nevertheless, "a strong *prima facie* obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman*, 556 F.3d at 1322 (citing *Leapfrog*, 485 F.3d at 1162).  For the reasons articulated above, IPS has presented a strong *prima facie* case of obviousness, particularly in light of *KSR*'s emphasis on a flexible analysis rooted in common sense.  As discussed below, moreover, the objective evidence of nonobviousness is not very strong; the evidence and reasoning underlying each of Oatey's secondary considerations is not, even viewed in the best light for Oatey, particularly persuasive.  Accordingly, the Court concludes that secondary considerations cannot save the '850 Patent.  *See Sundance, Inc. v. DeMonte Fabricating, Ltd.*, 550 F.3d 1356, 1368 (Fed. Cir. 2008) (reversing district court's holding finding nonobviousness, which was partially based on secondary considerations, and stating "[s]econdary considerations of nonobviousness-considered here by the district court-simply cannot overcome this strong *prima facie* case of obviousness."); *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61 (1969) (considering argument of secondary considerations but holding that "those

---

[25]  This is not to say that the Court would find infringement, either literal or under the doctrine of equivalence, were it required to analyze that issue.  Because the '850 Patent is invalid, the Court need not, and has not, reached the issue of infringement.

matters without invention will not make patentability"); *Agrizap, Inc.*, 520 F.3d at 1344; *Leapfrog*, 485 F.3d at 1162; *DyStar*, 464 F.3d at 1371 ("The presence of certain secondary considerations of nonobviousness are insufficient as a matter of law to overcome our conclusion that the evidence only supports a legal conclusion that claim 1 would have been obvious.").

First, although The Eliminator® was commercially successful, Oatey presented evidence indicating that (1) Oatey and IPS control 90% of the general plumbing supply market in regions where dual-drain-port WMOB's are preferred and (2) Plumbing supply distributors tend to purchase from a single plumbing supply manufacturer such as Oatey and IPS. Thus, each company's products were likely to be commercially successful, and the companies were in constant head-to-head competition with one another to keep pace by incrementally improving their products. As *KSR* instructs, however, "often . . . market demand . . . will drive design trends" and the patent laws are not designed to protect "advances that would occur in the ordinary course without real innovation" because such protection "retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility." 550 U.S. at 419. Oatey submits evidence that, after it began marketing The Eliminator®, IPS's customers started demanding a WMOB with a similar design. (Opp'n to Invalidity MSJ, Ex. G.) This is certainly evidence of market demand driving design trends, but, without, at least, a more concrete indication of the extent to which this was an innovation that would not have occurred in the ordinary course, the Court does not view it a strong objective evidence of nonobviousness.[26]

Second, with respect to long-felt need, Oatey has presented no evidence establishing a causal connection between the time it took to address the problem and the nonobviousness of the problem.

---

[26] Oatey's evidence, moreover, does not indicate whether and to what extent The Eliminator® was more or less successful than other WMOBs using a different design.

Again, based on the economic incentives at work, the fact that plumbing supply distributors are loyal to a single manufacturer likely slows industry response time to problems that arise. *Cf. Tokyo Keiso Co.*, 307 Fed. Appx. at 453 (affirming summary judgment on obviousness grounds where the district court rejected the patentee's long-felt need secondary consideration argument reasoning that "given the fact that the flow meter business involves a niche market, it is not surprising that it took a few years for a company to expand on the prior art at issue here."). Long-felt need, therefore, only provides some circumstantial evidence of nonobviousness.

Oatey also argues that IPS copied the design of The Eliminator® because (1) the products are similar and (2) IPS's customers requested a product like Oatey's. The fact that the products are similar could be an indication that IPS copied Oatey's design, or it could be an indication that Oatey's design is the next obvious step in the incremental improvement of WMOBs, *i.e.*, that it is "the work of the skillful mechanic, not that of the inventor" *Sundance, Inc.*, 550 F.3d at 1367 (quoting *Sakraida v. Ag Pro, Inc.*, 425 U.S. 273, 282 (1976) (quoting *Hotchkiss v. Greenwood*, 52 U.S. 248, 267 (1851))). The possibility that it is merely an incremental step is compelling given that a third-party, LSP, applied for a patent (the '881 Patent) on a design very similar to that embodied in both The Eliminator® and IPS's product within weeks of Oatey's application for the '850 Patent. Indeed, it is significant that, throughout this litigation, Oatey has never argued that LSP did not arrive at its invention independently of the '850 Patent.[27] In other words, if Oatey's design were really innovative, as opposed to a meaningful but obvious improvement, one would expect it to be readily distinguishable from a contemporaneous invention addressing the same problem.[28] This is,

---

[27] Oatey has, instead, argued that it can "swear behind" LSP's '881 Patent. (*See generally* Doc. 156, Tr. of Oral Hearing.)

[28] This is not to say that two designers cannot simultaneously invent a nonobvious solution to the same problem. The likelihood of this occurring is clearly less, however, when the

presumably, why the Federal Circuit has stated that "[c]opying by the accused infringer . . . has limited probative value in the absence of evidence of failed development efforts by the infringer, . . . or of more compelling objective indicia of other secondary considerations[.]" *Friskit v. Real Networks, Inc.*, 306 Fed. Appx. 610, 617 (Fed. Cir. 2009) (citing *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1381 (Fed.Cir.2000) (citing cases); *B.F. Goodrich Co. v. Aircraft Braking Sys. Corp.*, 72 F.3d 1577, 1583 (Fed.Cir.1996); *Pentec, Inc. v. Graphic Controls Corp.*, 776 F.2d 309, 317 (Fed.Cir.1985)) (omitting internal citations and quotations).  Here, Oatey did not present evidence suggesting that IPS attempted but failed to solve the problem addressed by the '850 Patent. Indeed, Oatey did not present evidence of failed efforts by <u>any</u> designer or plumbing manufacturer, nor is there any evidence that the improvement embodied by The Eliminator®, LSP's '881 Patent, or IPS's product was surprising or unexpected.

Accordingly, although the Court finds that Oatey has presented some objective evidence of nonobviousness, these secondary considerations do not overcome the strong showing of obviousness based on the first three *Graham* considerations.  *See Anderson's-Black Rock, Inc.*, 396 U.S. at 61 (1969) ("[Secondary considerations] without invention will not make patentability[.]")  Therefore, there is no genuine issue of material fact and IPS is entitled to judgment as a matter of law that the '850 Patent is invalid for failure to satisfy the nonobviousness requirement of 35 U.S.C. § 103.[29]

---

solution to the problem is an obvious improvement building on prior art as, opposed to a true, patentable innovation.

[29]  This finding of obviousness applies to all of the claims of the '850 Patent at issue.  In other words, for purposes of the obviousness analysis, the Court finds the distinctions between Claims 1, 2, 3, 5, and 17 irrelevant.  As explained above at note 4, the Federal Circuit has already found that the asserted claims cover the same subject matter.

### III.    <u>CONCLUSION</u>

Long ago, the Supreme Court articulated the balance of policy concerns underpinning this country's patent laws in dramatic terms.

> The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith.

*Atlantic Works v. Brady*, 107 U.S. 192, 200 (1883).  The Court does not attribute the parasitic purposes intimated by the Supreme Court in *Atlantic Works* to Oatey, and does not discount how well and successfully designers put common elements together to solve a problem created by a regulatory change.  It notes, however, that a more banal form of erosion has recently threatened the fundamental principles of patent protection exalted in *Atlantic Works*: extending patent protection to designs which do no more than take the next logical step in the creative process for which others laid the ground-work.  Hearkening back to those fundamental principles, *KSR* instructs the lower courts to focus on the essential requirements of 35 U.S.C. § 103 and perform a flexible, functional, and expansive analysis of obviousness guided by common sense and rooted in the *Graham* considerations.  Applying this approach to the facts and circumstances of this case, the Court must conclude that the '850 Patent is obvious as a matter of law.

For the foregoing reasons, *Defendant's Motion for Summary Judgment Based on Invalidity* (Doc. 128) is **GRANTED**.  Consequently, the '850 Patent is invalid, the remaining motions for

summary judgment (Docs. 127, 129, and 132) are **MOOT**, and this case is **DISMISSED**.


      **IT IS SO ORDERED.**

s/Kathleen M. O'Malley      
**KATHLEEN McDONALD O'MALLEY**
**UNITED STATES DISTRICT JUDGE**

**Dated: September 30, 2009**